UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: The Honorable Mark A. Barnett, Chief Judge

| | |
|---|---|
| _____ ) | |
| BGH EDELSTAHL SIEGEN GMBH, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES, ) | Ct. No. 24-00176 |
| ) | |
| Defendant, ) | |
| ) | |
| and ) | |
| ) | |
| ELLWOOD CITY FORGE COMPANY, *et. al.*, ) | |
| ) | |
| Defendant-Intervenors. ) | |
| _____ ) | |

## **ORDER**

Upon consideration of the Rule 56.2 Memorandum in support of its Motion for

Judgment upon the Agency Record filed by Plaintiff, BGH Edelstahl Siegen GmbH, and all

other papers and proceedings had herein, it is hereby

ORDERED that said motion is GRANTED, and it is further

ORDERED that this case is remanded to the U.S. Department of Commerce, with

instructions that Commerce redetermine aspects of its final results of administrative review as

instructed by this Court in its accompanying slip opinion.

SO ORDERED.


Date: _____, 2025                    _____
     New York, New York                              Mark A. Barnett, Chief Judge

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: The Honorable Mark A. Barnett, Chief Judge

_____
                                                  )
BGH EDELSTAHL SIEGEN GMBH,                         )
                                                  )
                            Plaintiff,             )
                                                  )
            v.                                     )
                                                  )
UNITED STATES,                                     )        Ct. No. 24-00176
                                                  )
                            Defendant,             )
                                                  )
            and                                    )
                                                  )
ELLWOOD CITY FORGE COMPANY, *et. al.*,             )
                                                  )
                    Defendant-Intervenors.         )
_____           )

**BGH EDELSTAHL SIEGEN GMBH**
**MOTION FOR JUDGMENT UPON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of this Court, Plaintiff, BGH Edelstahl Siegen GmbH

("BGH"), respectfully moves this Court for an order granting movant judgment on the agency

record against Defendant, the United States (representing the U.S. Department of Commerce

("Commerce")), including, but not limited to the following relief:

- Remand to Commerce to reconsider its determination treating home market
  sales of certain forged steel products not meeting the common definition of
  fluid end blocks as merchandise under review;

- Remand to Commerce to reconsider its determination comparing home market
  sales of certain forged steel products not meeting the common definition of
  fluid end blocks with BGH's U.S. sales of forged steel fluid end blocks;

- Granting BGH such other relief as the Court may deem appropriate.

A memorandum of points and authorities in support of this motion is being filed contemporaneously with this motion.

WHEREFORE, for the reasons described in this motion and the accompanying memorandum in support thereof, BGH respectfully requests that the Court enter judgment in its favor.  A proposed order is submitted with this motion for the Court's consideration.

Respectfully submitted,

/s/ *Marc E. Montalbine*
Marc E. Montalbine*
J. Kevin Horgan
Merisa A. Horgan
**DEKIEFFER & HORGAN, PLLC**
1015 Fifteenth Street, N.W.
6th Floor
Washington, D.C. 20005
Tel: (202) 783-6900
Fax:  (202) 783-6909
Email:  montalbine@dhlaw.de

Date: March 17, 2025                    *Counsel to BGH Edelstahl Siegen GmbH*

---

\* Admitted to Virginia Bar; practice limited to Federal International Trade Matters pursuant to D.C. Bar Rule 49(c)(2).

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: The Honorable Mark A. Barnett, Chief Judge

| | |
|---|---|
| BGH EDELSTAHL SIEGEN GMBH, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES, ) | Ct. No. 24-00176 |
| ) | |
| Defendant, ) | |
| ) | |
| and ) | **PUBLIC VERSION** |
| ) | |
| ELLWOOD CITY FORGE COMPANY, *et. al.*, ) | Confidential information deleted |
| ) | on pages 12, 19-23, 28-30 |
| ) | & Appendix 1 |
| Defendant-Intervenors. ) | |
| ) | |

## BGH EDELSTAHL SIEGEN GMBH
## RULE 56.2 MEMORANDUM IN SUPPORT OF
## <u>MOTION FOR JUDGMENT UPON THE AGENCY RECORD</u>

<div align="right">

Marc E. Montalbine
J. Kevin Horgan
Merisa A. Horgan
**deKIEFFER & HORGAN, PLLC**
1015 Fifteenth Street, N.W.
6th Floor
Washington, D.C. 20005
Tel: (202) 783-6900
email:  montalbine@dhlaw.de
*Counsel to BGH Edelstahl Siegen GmbH*

</div>

Dated: March 17, 2025

# TABLE OF CONTENTS

I.      RULE 56.2 STATEMENT ....................................................................................... 1

     A.      Administrative Determinations Sought to be Reviewed ........................................ 1

     B.      Issues Presented ..................................................................................... 1

II.     STATEMENT OF FACTS ....................................................................................... 1

III.    SUMMARY OF ARGUMENT ................................................................................. 5

IV.     ARGUMENT .......................................................................................................... 7

     A.      Standard of Review................................................................................. 7

     B.      Commerce Improperly Treated Certain Forged Products Sold in
          the Home Market as Products Under Review........................................................ 8

          1.      The Products Under Review Are Expressly Limited to Forged
               Steel Fluid End Blocks........................................................................... 8

          2.      Commerce Improperly Applied the Description of Products
               Under Review by Giving No Effect to the Term
               "Fluid End Blocks"............................................................................... 18

     C.      In the Alternative, Commerce Should Account for the Difference
          in Product Types in Its Dumping Calculations .................................................. 26

V.      CONCLUSION AND PRAYER FOR RELIEF ........................................................ 31

# TABLE OF AUTHORITIES

**Cases**

AG der Dillinger Hüttenwerke v. United States,
   672 F. Supp. 3d 1351 (CIT 2023) ............................................................. 28

AG der Dillinger Hüttenwerke v. United States,
   648 F. Supp. 3d 1321 (CIT 2023) ............................................................. 28

ArcelorMittal Stainless Belgium N.V. v. United States,
   694 F.3d 82 (Fed. Cir. 2012) ............................................................. 10, 17

Atkore Steel Components, Inc. v. United States,
   313 F. Supp. 3d 1374 (CIT 2018) ............................................................. 23, 24

Bohler Bleche GMBH & Co. KG v. United States,
   324 F. Supp. 3d 1344 (CIT 2018) ............................................................. 27, 28

Dibble v. Fenimore,
   545 F.3d 208 (2d Cir. 2008) ............................................................. 14

Duferco Steel, Inc. v. United States,
   296 F.3d 1087 (Fed. Cir. 2002) ............................................................. 17

Eckstrom Indus., Inc. v. United States,
   254 F.3d 1068 (Fed. Cir. 2001) ............................................................. 7, 17

Garg Tube Exp. LLP v. United States,
   740 F. Supp. 3d 1355 (CIT 2024) ............................................................. 7

Interval Licensing LLC v. AOL, Inc.,
   766 F.3d 1364 (Fed. Cir. 2014) ............................................................. 14

King Supply Co., LLC v. United States,
   674 F.3d 1343 (Fed. Cir. 2012) ............................................................. 17

Loper Bright Enterprises v. Raimondo,
   144 S.Ct. 2244 (2024) ............................................................. 7

Medline Indus., Inc. v. United States,
   62 F.3d 1407 (Fed. Cir. 1995) ............................................................. 9

Meridian Prods., LLC v. United States,
   851 F.3d 1375 (Fed. Cir. 2017) ............................................................. 17

OMG, Inc. v. United States,
  972 F.3d 1358 (Fed. Cir. 2020)..................................................................................*passim*

OMG, Inc. v. United States,
  321 F. Supp. 3d 1262 (CIT 2018)............................................................................23

Pesquera Mares Australes Ltda. v. United States,
  266 F.3d at 1382 (Fed. Cir. 2001)...........................................................................26

Union Steel v. United States,
  753 F. Supp. 2d 1317 (CIT 2011)............................................................................26

Wheatland Tube Co. v. United States,
  973 F. Supp. 149, 158 (CIT 1997)....................................................... 16, 17, 25, 26

**Statutes**

19 U.S.C. § 1673 ................................................................................................ 17, 26

**Administrative Determinations**

Certain Carbon and Alloy Steel Cut-To- Length Plate from Austria, Belgium, France, the
Federal Republic of Germany, Italy, Japan, the Republic of Korea, and Taiwan, 82 Fed. Reg.
24096 (2017)..........................................................................................................29, 30

Fluid End Blocks from China, Germany, India, and Italy, Inv. Nos. 701-TA-632-635 and 731-
TA-1466 and 731-TA-1468 (Final), USITC Pub. 5152 (Jan. 2021) ....................10, 16

**Other Authorities**

Black's Law Dictionary, 895 (11th ed. 2019)...............................................................14

## I.    RULE 56.2 STATEMENT

Pursuant to Rule 56.2(c)(1) of the Rules of this Court, Plaintiff, BGH Edelstahl Siegen GmbH ("BGH" or "BGH Siegen"), hereby states the administrative decision sought to be reviewed and the issues of law presented:

### A.  Administrative Determinations Sought to be Reviewed

The U.S. Department of Commerce ("Commerce") published its contested final results of administrative review in the *Federal Register* on August 19, 2024.  Forged Steel Fluid End Blocks from the Federal Republic of Germany: Final Results of the Antidumping Duty Administrative Review; 2022, 89 Fed. Reg. 67072 (Aug. 19, 2024) ("Final Results"); *see also* accompanying Issues and Decision Memorandum (Aug. 9, 2024) ("IDM"); P.R. 99.[1]  The weighted-average dumping margin assigned to BGH was 19.96%.

### B.  Issues Presented

1.    Issue One:  Whether Commerce erred in treating home market sales of certain forged steel products not meeting the common definition of fluid end blocks as merchandise under review?

2.    Issue Two:  In the alternative, whether Commerce erred in comparing home market sales of certain forged steel products not meeting the common definition of fluid end blocks with BGH's U.S. sales of forged steel fluid end blocks?

## II.    STATEMENT OF FACTS

On March 14, 2023, Commerce published in the *Federal Register* a notice of initiation of administrative review for the antidumping duty order on forged steel fluid end blocks from Germany covering the second review period (*i.e.*, January 1, 2022 to December 31, 2022).

---

[1] In accordance with the Chambers Procedures of this Court, citations to the confidential record are designated as "C.R." and citations to the public record are designated as "P.R."

<u>Initiation of Antidumping and Countervailing Duty Administrative Reviews</u>, 88 Fed. Reg. 15642 (March 14, 2023) (P.R. 14).  BGH Siegen was named as a respondent.

Commerce issued its initial antidumping questionnaire to BGH Siegen on April 20, 2023. (P.R. 24).  In the questionnaire, Commerce instructed BGH Siegen to report sales and cost data concerning "merchandise under review," defined as "all products within the scope of the review."  (P.R. 24, p. A-1, n.1).  This definition was further categorized into products sold in the U.S. market as "subject merchandise" and products sold in the home market as "foreign like product."  <u>Id</u>.  Commerce also explained that, "{w}hen used in the questionnaire, foreign like product means all merchandise that is sold in the foreign market and that fits within the description of merchandise provided in Appendix III to the questionnaire."  (P.R. 24, p. I-9).

For a description of products or merchandise under review, Commerce provided the scope language in Appendix III of the questionnaire, which stated:

> The products under review are forged steel fluid end blocks (fluid end blocks), whether in finished or unfinished form, and which are typically used in the manufacture or service of hydraulic pumps.

(P.R. 24, App. III).  In addition, the product description listed certain ranges for chemical composition and dimensions that were required of subject fluid end blocks.  Fluid end blocks ("FEBs") are defined in the U.S. Harmonized Tariff Schedule as parts of hydraulic fluid power pumps under HTSUS No. 8413.91.9055, and the U.S. International Trade Commission ("ITC") defines FEBs as "steel forgings that are a component of fluid end modules ("FEMs"), which are incorporated into hydraulic pumps."  <u>Fluid End Blocks from China, Germany, India, and Italy</u>, Inv. Nos. 701-TA-632-635 and 731-TA-1466 and 731-TA-1468 (Final), USITC Pub. 5152 (Jan. 2021) 10.

In compliance with the definition of products under review, BGH Siegen reported its sales of forged steel fluid end blocks to the United States during the period of review ("POR"). All of these U.S. sales consisted of fluid end blocks imported under HTSUS No. 8413.91.9055. Neither BGH Siegen nor any of its affiliates exported any other forged steel products[2] to the United States falling within the ranges for chemical composition and dimensions listed in the product description.

BGH Siegen reported its home market sales of forged steel blocks in a similar manner. BGH Siegen reported all home market sales of forged steel products to Germany falling within the ranges for chemical composition and dimensions listed in the product description. However, BGH noted that certain of these forged blocks did not meet the definition of fluid end blocks because they were produced according to particular customer drawings and specifications for application in expressly defined end products, such as military equipment ("Military Equipment Blocks") and plastic extruders and compounding machines ("Compounding Machine Blocks"). BGH Siegen specifically identified these transactions by reporting the particular drawing number specified by the customer for each product in the field DRAWINGH. No other sales in the home market sales database have information reported in the field DRAWINGH. BGH Siegen also provided detailed information on these transactions and corresponding customers in its questionnaire responses. (P.R. 37, C.R. 9, App. A-8) (P.R. 71, C.R. 45, pp. 8-10 & App. SA-5 & SA-6).

BGH Siegen also informed Commerce that an affiliated company, BGH Lippendorf, sold forged bars in the German market that fell within the ranges for chemical composition and

---

[2] Numerous types of products can be produced by forging, such as blocks, bars and intricate machine parts (*e.g.*, turbines, rotors, propeller shafts, disks, *etc.*).

dimensions listed in the product description but did not meet the definition of fluid end blocks due to differences in configuration, core compression and other physical and mechanical properties.  BGH Siegen did not report the sales of forged bar produced by BGH Lippendorf in its normal home market sales file.  Rather, BGH Siegen reported these sales in a separate file of "excluded (non-subject) transactions" (bghhm_ns02.sas7bdat) and provided a detailed explanation showing why these products did not meet the definition of products under review. (P.R. 44, C.R. 19, p. 9, App. B-4 & B-5).

On December 20, 2023, BGH Siegen submitted pre-preliminary comments, reiterating that home market sales of forged bars, Military Equipment Blocks and Compounding Machine Blocks did not meet the definition of fluid end blocks and therefore should be excluded from the home market sales database when calculating the antidumping duty margin on BGH's U.S. sales of forged steel fluid end blocks.  (P.R. 73, C.R. 60).

On February 7, 2024, Commerce published notice of its preliminary results in the *Federal Register*.  Forged Steel Fluid End Blocks from Germany: Preliminary Results of Antidumping Duty Administrative Review and Rescission, in Part; 2022, 89 Fed. Reg. 8409 (Feb. 7, 2024) (P.R. 86).  Contrary to the evidence submitted by BGH showing that home market sales of forged bars, Military Equipment Blocks and Compounding Machine Blocks did not meet the definition of fluid end blocks, Commerce included these transactions in calculating the antidumping duty margin on BGH's U.S. sales of forged steel fluid end blocks.  In the preliminary results, Commerce determined an estimated weighted-average dumping margin for BGH Siegen of 19.96%.

On March 8, 2024, BGH submitted a case brief to Commerce and, on March 15, 2024, petitioners submitted a rebuttal brief.  (P.R. 88, C.R. 84) (P.R. 89).  On July 25, 2024, Commerce held a virtual public hearing.

On August 19, 2024, Commerce published notice of its final results in the Federal Register.  Final Results, 89 Fed. Reg. 67072.  (P.R. 100).  In the Final Results, Commerce continued to include home market sales of forged bars, Military Equipment Blocks and Compounding Machine Blocks in calculating the antidumping duty margin on BGH's U.S. sales of forged steel fluid end blocks, and the weighted-average dumping margin for BGH Siegen remained unchanged at 19.96%.

## III.    SUMMARY OF ARGUMENT

In its final results, Commerce improperly treated certain forged products sold in the home market as products under review.  The products under review are expressly limited to "forged steel fluid end blocks."  Fluid end blocks ("FEBs") are defined in the U.S. Harmonized Tariff Schedule as parts of hydraulic fluid power pumps, and the U.S. International Trade Commission ("ITC") defines FEBs as "steel forgings that are a component of fluid end modules ("FEMs"), which are incorporated into hydraulic pumps."  Fluid End Blocks from China, Germany, India, and Italy, Inv. Nos. 701-TA-632-635 and 731-TA-1466 and 731-TA-1468 (Final), USITC Pub. 5152 (Jan. 2021) 10.  Commerce does not dispute this common definition of fluid end blocks; nor does Commerce claim that this term is in any way ambiguous.  Thus, having found no ambiguity in the term "fluid end blocks," Commerce was obliged to give this language its plain meaning.

Nevertheless, Commerce simply ignored the term "fluid end blocks" when applying the definition of products under review to BGH's home market sales.  Rather, Commerce looked

exclusively to the physical characteristics listed in the definition of products under review in determining that a wide range of forged products sold in the home market met the "scope description of the order" without making any determination that these products met the common meaning of "fluid end blocks." However, a clear reading of the description of products under review in Appendix III of the questionnaire shows that none of the physical characteristics listed in the definition are meant to expand the scope of merchandise beyond the group of products commonly known as fluid end blocks. Rather, these physical characteristics serve only to narrow the type of fluid end blocks meeting the product description.

The fact that the product scope was never intended to cover forged products that do not meet the common definition of fluid end blocks is further demonstrated by petitioners' sworn submissions and testimony during the ITC injury investigation as well as the ITC's subsequent injury determination and Commerce's preliminary and final scope decisions in the original investigation.

Commerce therefore erred in treating forged bars and specially produced forged blocks designed for the manufacture of military equipment ("Military Equipment Blocks") and plastic extruders and compounding machines ("Compounding Machine Blocks") sold in the German market as products under review even though they did not meet the common definition of "fluid end blocks." Contrary to law, Commerce gave no effect to the term "fluid end block" in interpreting the product description in this administrative review,

In the alternative, when Commerce included home market sales of additional products that were not fluid end blocks in its dumping calculations, it should have accounted for the difference in product types. The vehicle used by Commerce to account for product differences is the control number or "CONNUM." The CONNUM is constructed using a hierarchy of product

characteristics (also known as the model-match criteria). In this administrative review, the model-match criteria were designed for one product (*i.e.*, forged steel fluid end blocks) sold to one group of customers (*i.e.*, pump manufacturers). Unlike other proceedings involving steel products covering different product types, Commerce made no adjustments to its model-match criteria in this administrative review. BGH's home market sales of forged bars, Military Equipment Blocks and Compounding Machine Blocks are not comparable to its U.S. sales of fluid end blocks, and Commerce erred when it included sales of these products in its margin calculations.

## IV.    ARGUMENT

### A.    Standard of Review

Courts exercise their independent judgment in deciding statutory meaning and in deciding whether an agency has acted within its statutory authority. *See*, Garg Tube Exp. LLP v. United States, 740 F. Supp. 3d 1355, 1365 (CIT 2024). (citing Loper Bright Enterprises v. Raimondo, 144 S.Ct. 2244, 2263 & 2273 (2024). When reviewing Commerce's determination concerning the description of products under review in a proceeding, the question of whether the unambiguous terms of the scope language control or whether some ambiguity exists is a question of law. OMG, Inc. v. United States, 972 F.3d 1358, 1363 (Fed. Cir. 2020). The question of whether a product meets the unambiguous scope terms presents a question of fact reviewed for substantial evidence. Id. at 1364. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Eckstrom Indus., Inc. v. United States, 254 F.3d 1068, 1071 (Fed. Cir. 2001).

B.    **Commerce Improperly Treated Certain Forged Products Sold in the Home Market as Products Under Review**

In its final results, Commerce improperly treated certain forged steel products sold in the home market as products under review even though these products did not meet the common definition of fluid end block.

1.    **The Products Under Review Are Expressly Limited to Forged Steel Fluid End Blocks**

In the initial antidumping questionnaire issued to BGH Siegen, Commerce defined the terms "products under review" and "merchandise under review" as follows:

> Throughout this questionnaire, whenever we refer to the "products under review" or "merchandise under review," we are referring generally to all products within the scope of the review that your company sold during the period of review in any market. When we use the term subject merchandise, we are referring to products sold to the United States. When we use the term foreign like product, we are referring to products sold in your home market or exported to a country other than the United States. We have provided a description of the merchandise under review in Appendix III.

Request For Information, A-1, n.1 (Apr. 20, 2023) ("Questionnaire");[3] P.R. 24. Thus, in order to be considered products or merchandise under review, a product, whether sold to the United States or in the German home market, would have to meet the description of the merchandise under review in Appendix III of the questionnaire. This is also confirmed by the definition of "Foreign Like Product" provided in Appendix I of the questionnaire, which states in pertinent part:

> When used in the questionnaire, foreign like product means all merchandise that is sold in the foreign market and that fits within the description of merchandise provided in Appendix III to the questionnaire.

Id. at I-9.

---

[3] A similar definition of "merchandise under consideration (MUC)" is given in Section D of the initial questionnaire. See Id. at D-1, n.24; P.R. 24.

The description of products under review in Appendix III states:

> The products under review are forged steel fluid end blocks (fluid end blocks), whether in finished or unfinished form, and which are typically used in the manufacture or service of hydraulic pumps.

Id. at App. III.  The primary element of this description is that the products under review are expressly limited to "fluid end blocks."  Accordingly, any product that does not meet the definition of "fluid end blocks" cannot be consider as merchandise under review.  While the product description goes on to define the terms "forged," "steel," "finished condition" and "unfinished condition," the term "fluid end blocks" is not otherwise defined.  Therefore, the product description must be understood as applying the plain, common meaning of "fluid end blocks."  See OMG, Inc. v. United States, 972 F.3d 1358 (Fed. Cir. 2020) (finding that Commerce's treatment of certain fasteners as "nails" was in conflict with the term's unambiguous, common meaning); see also, Medline Indus., Inc. v. United States, 62 F.3d 1407, 1409 (Fed. Cir. 1995) (explaining that tariff terms are construed in accordance with their common and popular meaning).

Fluid end blocks ("FEBs") are clearly defined in the U.S. Harmonized Tariff Schedule as parts of hydraulic fluid power pumps under HTSUS No. 8413.91.9055.

| Heading/ Subheading | Stat. Suf- fix | Article Description |
|---|---|---|
| 8413 | | Pumps for liquids, whether or not fitted with a measuring device; liquid elevators; part thereof: |
| | | Parts: |
| 8413.91 | | Of pumps: |
| 8413.91.10 | 00 | Of fuel-injection pumps for compression-ignition engines[44/]................................................ |
| 8413.91.20 | 00 | Of stock pumps imported for use with machines for making cellulosic pulp, paper or paperboard... |
| 8413.91.90 | | Other.................................................................. |
| | 10 | Of subheading 8413.30.90[38].......................... |
| | | Of hydraulic fluid power pumps: |
| | 55 | Fluid end blocks....................................... |

Harmonized Tariff Schedule of the United States (2022)

Similarly, as explained by the U.S. International Trade Commission ("ITC") in its final

determination in the underlying injury investigation, "FEBs are steel forgings that are a

component of fluid end modules ("FEMs"), which are incorporated into hydraulic pumps."

Fluid End Blocks from China, Germany, India, and Italy, Inv. Nos. 701-TA-632-635 and 731-

TA-1466 and 731-TA-1468 (Final), USITC Pub. 5152 (Jan. 2021) 10 ("ITC Final

Determination").[4]

In its final results, Commerce does not dispute this common definition of fluid end

blocks; nor does Commerce claim that this term is in any way ambiguous. Having found no

ambiguity in the term "fluid end blocks," Commerce was obliged to give this language its plain

meaning. See ArcelorMittal Stainless Belgium N.V. v. United States, 694 F.3d 82, 87 (Fed. Cir.

2012) (stating that when scope language "is not ambiguous, the plain meaning of the language

---

[4] Fluid end modules are the part of a pump that produces the pumping process with valves, pistons and liners. Antidumping & Countervailing Duty Petitions (Volume I), 10 & Ex. GEN-10 (Dec. 19, 2019) (Barcode: 3921722-01 (A-428-847 INV)) ("AD/CVD Petitions").

governs").  Nevertheless, Commerce simply ignored the term "fluid end blocks" when applying

the definition of products under review to BGH's home market sales.  Rather, Commerce looked

exclusively to the physical characteristics listed in the definition of products under review in

determining that a wide range of forged products sold in the home market met the "scope

description of the order" without making any determination that these products met the common

meaning of "fluid end blocks."  *See* IDM, 6-7 & 10; P.R. 99.

However, a clear reading of the description of products under review in Appendix III of

the questionnaire shows that none of the physical characteristics listed in the definition are meant

to expand the scope of merchandise beyond the group of products commonly known as fluid end

blocks ("FEBs").  For example, the definition of the term "forged" simply provides the

manufacturing process required of subject FEBs (*i.e.*, an FEB produced by an alternative

manufacturing process would not meet the description of merchandise under review).  *See*

Questionnaire, App. III; P.R. 24.  This definition does not expand the products under review to

include any steel product made by forging regardless of whether it is an FEB.

Forging is the process of applying repeated localized compressive force to a steel ingot in

order to produce an item having the desired shape and physical/mechanical properties.  *See* BGH

Section B Questionnaire Response, App. B-4, p. 2 (June 13, 2023) ("Section B Response"); P.R.

44, C.R. 19.  The forging process alters the grain texture of the steel thereby giving the finished

product its physical and mechanical properties.  Id.; *see also* Questionnaire, App. III; P.R. 24.

Numerous types of products can be produced by forging, such as blocks, bars and

intricate machine parts (*e.g.*, turbines, rotors, propeller shafts, disks, *etc.*).  Forged blocks are

large solid steel blocks of rectangular or square cross section, having a very large cross-sectional

dimension.  Section B Response, App. B-4, pp. 2 & 7; P.R. 44, C.R. 19.  By contrast, forged bars

have a very small cross-sectional dimension and are normally forged in lengths of well over two meters.  Id. at p. 7.

Forged blocks can also be produced according to particular customer drawings and specifications for application in expressly defined end products.  This is the case with respect to the fluid end blocks produced by BGH Siegen, as well as specially produced forged blocks designed for the manufacture of military equipment ("Military Equipment Blocks") and plastic extruders and compounding machines ("Compounding Machine Blocks") sold in the German market.  *See* BGH Sections A-C Supplemental Response, 8-10 & App. SA-5 & SA-6 (Dec. 12, 2023) ("Section A-C Supplemental Response"); P.R. 71, C.R. 45.

The size and type of forging press needed to produce a given product is dictated by the size of the ingot required and the physical/mechanical properties of the finished product.  Because of the very high pressures that FEBs must withstand, they require an exacting microstructure and specialized mechanical properties.  This requires a very high forging reduction rate of at least ([     ]).  Section B Response, App. B-4, p. 3; P.R. 44, C.R. 19.  This means that the ingot used as the raw material for the forged steel block must be [     ] times larger than the cross-sectional dimensions of the forged steel block.  To achieve this high reduction ratio on such large blocks and ensure good core formation, the use of a large open-die forging press with a force of at least 40 MN is essential.  Id.  The manipulator, which holds and moves the ingot during the forging process, must also have the power and size to carry the ingot and finished forged product without tipping over.  BGH Siegen is the only BGH group company possessing such a large open-die forging press and related equipment.  Id. at pp. 3-4.

 

Open-die forging press with ingot       Example of a manipulator with forging

<u>Section A-C Supplemental Response</u>, App. SA-4, pp. 4-5; P.R. 71, C.R. 44.

Accordingly, a forged steel fluid end block is a specially manufactured product not interchangeable with other forged products.

Similar to the definition of the term "forged," the definition of "steel" also does not expand the product description to include any forged steel products regardless of type containing certain chemical elements but rather narrows the type of fluid end blocks meeting the product description. *See* <u>Questionnaire</u>, App. III; P.R. 24. For example, fluid end blocks not containing the defined chemical elements would not be considered products under review.

The listed product dimensions operate in the same manner. The product dimensions do not state that any forged steel product meeting the broad dimensional ranges is a subject FEB. Rather, the dimensional ranges are expressly limited to "fluid end blocks" either "cut-to-length" or in "strings." <u>Id</u>. In either case, a product first has to meet the definition of a fluid end block and then meet the dimensional ranges to satisfy the description of products under review. The references to minimum tensile strength and hardness in the product description also do not expand the products under review to include any forged steel product meeting the given tensile strength and hardness values regardless of whether the product is a fluid end block.

13

The product description's definitions of "finished condition" and "unfinished condition" further confirm that the common meaning of fluid end block as a part of a pump is intended.  The product description states:

> A fluid end block may be imported in finished condition (*i.e.*, ready for incorporation into a pump fluid end assembly without further finishing operations) or unfinished condition (*i.e.*, forged but still requiring one or more finishing operations before it is ready for incorporation into a pump fluid end assembly).

Questionnaire, App. III; P.R. 24.  This definition shows that whether in finished condition or unfinished condition a fluid end block is a product designed "for incorporation into a pump fluid end assembly."  The use of the Latin abbreviation "*i.e.,*" which stands for "*id est*" meaning "that is," provides a limiting description of the given term.  *See* Black's Law Dictionary, 895 (11th ed. 2019).  The use of "*i.e.*" indicates an exhaustive list or definition rather than an example.  *See* Interval Licensing LLC v. AOL, Inc., 766 F.3d 1364, 1373 (Fed. Cir. 2014); Dibble v. Fenimore, 545 F.3d 208, 219 (2d Cir. 2008).  Thus, whether in finished or unfinished condition, fluid end blocks are designed and intended for "incorporation into a pump fluid end assembly."

The fact that the definition of fluid end block in unfinished condition was not meant to expand the products under review to any forged steel products regardless of their connection to fluid end blocks is supported by petitioners' own sworn submissions and testimony during the ITC injury investigation.  As evidenced by this information, an "unfinished" fluid end block is defined in reference to a finished fluid end block.  For example, the first amended petition stresses that "unfinished" fluid end blocks are "dedicated for eventual use in the fluid end assembly of a hydraulic pump."  Amendment of Petitions and Response to Commerce's Supplemental Questions, 6 (Dec. 30, 2019) (Barcode: 3924877-01 (A-428-847 INV)) ("First

Amended AD/CVD Petitions") (quoted in BGH Case Brief, 4); P.R. 88, C.R. 84.  The first

amended petition further explains that:

> Furthermore, there are no separate markets or functions for unfinished FEBs as distinct from finished FEBs - *i.e.*, they are all sold to pump manufacturers.  The only difference is the extent to which the forger or the pump manufacturer elects to perform the finishing functions.

Id.

     Representatives for the petitioners also gave sworn testimony to this effect at the ITC

Staff Conference during the original injury investigation on January 9, 2020.  In response to

questions posed by James Stamps, ITC International Trade Analyst, petitioners' representatives

stated as follows:

> MR. STAMPS:  Thank you.  Can unfinished FEB forgings be used for anything else other than for the production of finished FEBs?
>
> MR. SHIRLEY:  Mark Shirley, Finkl Steel.  No.  Once it's forged out to a block like Mr. Boyd described, it is fully dedicated to becoming an FEB.
>
> MS. SAUNDERS:  Kathy Saunders, Ellwood City Forge.  I agree.  There are certain chemistries and configurations of the fluid end blocks.  Once it's forged to that configuration, there's usually no other -- no other opportunity to use it for something else.
>
> MR. LEVY:  Mr. Stamps, Jack Levy for Petitioners.  Just in the interest of full candor, there are uneconomic uses for these blocks. You could, you know, put them back in the pot as scrap.  But, you know, there would be no business reason to do so.  So from an economic perspective, once you go through the great expense of producing to a custom chemistry and a customs' forging, and a custom dimension of what you saw in Sample A, at that point you are dealing with a product that is dedicated for use in a fluid end module.  And all that remains is the finishing so that it can be employed in that use.

ITC Staff Conference Transcript, 53-54 (Jan. 9, 2020) (quoted in BGH Case Brief, 5); P.R. 88,

C.R. 84.  Later, during the conference, Mr. Stamps posed the same question to Josh Lowrey of

Galtway Industries in the following exchange:

MR. STAMPS:  Thank you.  I have a few questions just to round the circle on some issues.  Can the unfinished FEB forgings be used for anything else other than for the production of FEBs, finished FEBs?

MR. LOWREY:  Paperweights.  Yeah, I back up what Finkl and Ellwood said, nothing.

Id. at 136 (quoted in BGH Case Brief, 5-6); P.R. 88, C.R. 84.

Based upon these sworn submissions and testimony, the ITC found that "unfinished FEBs are an intermediate product dedicated exclusively to the production of finished FEBs, with no other uses" and that "{t}here is no separate market for unfinished FEBs."  Fluid End Blocks from China, Germany, India, and Italy, Inv. Nos. 701-TA-632-635 and 731-TA-1466-1468 (Preliminary), USITC Pub. 5017, 11 (Feb. 2020) (emphasis added) (citing ITC Staff Conference Transcript, 53-54 & 136) (quoted in BGH Case Brief, 6); P.R. 88, C.R. 84.  Pursuant to this finding, the ITC based its injury determination on a single domestic like product for finished and unfinished FEBs, which the ITC clearly stated were "dedicated exclusively to the production of finished FEBs."  The ITC continued its finding on the single domestic like product for finished and unfinished FEBs in its final determination and reiterated its understanding that "the information available indicated that all unfinished FEBs are dedicated to the production of finished FEBs and that there is no separate market for unfinished FEBs."  Fluid End Blocks from China, Germany, India, and Italy, Inv. Nos. 701-TA-632-635 and 731-TA-1466 and 731-TA-1468 (Final), USITC Pub. 5152, 11-12 (Jan. 2021) (quoted in BGH Case Brief, 6); P.R. 88, C.R. 84.

Accordingly, the extent of the ITC's injury determination was expressly limited to finished FEBs and unfinished FEBs "dedicated exclusively to the production of finished FEBs."  The ITC made no injury determination concerning general forged steel products not within the same domestic like product as finished FEBs.  As this Court explained in Wheatland Tube,

16

Commerce may not expand the scope of a proceeding "beyond the limits of the ITC injury determination." Wheatland Tube Co. v. United States, 973 F. Supp. 149, 158 (CIT 1997) (citing 19 U.S.C. § 1673 (1994)); *see also* King Supply Co., LLC v. United States, 674 F.3d 1343, 1348 (Fed. Cir. 2012) (stating that Commerce may not interpret an antidumping order so as to change the scope of that order or interpret the order in a manner contrary to its terms); Duferco Steel, Inc. v. United States, 296 F.3d 1087, 1089 (Fed. Cir. 2002) (stating that "{s}cope orders may be interpreted as including subject merchandise only if they contain language that specifically includes the subject merchandise or may be reasonably interpreted to include it").

Therefore, in order to be considered products under review, a product must comport with the common meaning of a "fluid end block." As stated above, Commerce did not dispute the common definition of fluid end blocks or claim that the term was in any way ambiguous in its final results. Rather, Commerce simply ignored the term "fluid end blocks" when applying the definition of products under review to BGH's home market sales, treating the repeated use of the term in the product definition as mere surplusage. As the U.S. Court of Appeals for the Federal Circuit ("Federal Circuit") found in *Eckstrom*, Commerce errs when its treats limiting language in the scope of an antidumping order as mere surplusage. Eckstrom Indus. v. United States, 254 F.3d 1068, 1073 (Fed. Cir. 2001); *see also* Meridian Prods., LLC v. United States, 851 F.3d 1375, 1383 (Fed. Cir. 2017) (holding that scope interpretation must consider all the terms).

Accordingly, Commerce erred as a matter of law by ignoring the term "fluid end blocks" when applying the definition of products under review to BGH's home market sales. The first step in applying the product definition ("scope language") in a proceeding is to determine if there is an ambiguity in the language. When the scope language "is not ambiguous, the plain meaning of the language governs." ArcelorMittal Stainless Belgium N.V. v. United States, 694 F.3d 82,

87 (Fed. Cir. 2012).[5]  Having found no ambiguity in the term "fluid end blocks," Commerce was obliged to give this language its plain meaning but rather simply ignored the term when applying the definition of products under review to BGH's home market sales.  For this reason alone, Commerce's determination cannot be sustained.

> ### 2.    Commerce Improperly Applied the Description of Products Under Review by Giving No Effect to the Term "Fluid End Blocks"

As explained above, the primary element of the product description in this administrative review is that a product must comport with the common meaning of a "fluid end block." Nevertheless, in interpreting the product description in this administrative review, Commerce gave no effect to the term "fluid end block."  Rather, Commerce simply treated as "merchandise under review" any forged steel products falling within the ranges for chemical composition and dimensions listed in the product description regardless of whether the products met the common meaning of fluid end blocks.  *See, e.g.,* IDM, 10 (stating, "BGH's bars and customized blocks are in-scope because they meet the physical definition of FEBs provided in the scope description"); P.R. 99.

Here it is important to note that all of BGH Siegen's sales of subject merchandise to the United States during the period of review ("POR") consisted of fluid end blocks imported under HTSUS No. 8413.91.9055.  Neither BGH Siegen nor any of its affiliates exported any other forged steel products to the United States falling within the ranges for chemical composition and dimensions listed in the product description.  Therefore, the sole issue is whether products such as forged steel bars and specially produced Military Equipment Blocks and Compounding

---

[5] The question of whether the unambiguous terms of the scope language control or whether some ambiguity exists is a question of law.  OMG, Inc. v. United States, 972 F.3d 1358, 1363 (Fed. Cir. 2020).

Machine Blocks sold in the German market fall within the definition of merchandise under review.

The forged steel bars sold in Germany during the POR were not produced by BGH Siegen but rather by an affiliated company, BGH Lippendorf.  As explained above, forged steel bars are substantially different from forged steel blocks.  *See* discussion *supra* pp. 11-12.  Forged blocks are large solid steel blocks of rectangular or square cross section, having a very large cross-sectional dimension.  Section B Response, App. B-4, p. 7; P.R. 44, C.R. 19.  By contrast, forged bars have a very small cross-sectional dimension and are normally forged in lengths of well over two meters.  Id.  Because of the small cross-sectional dimension, forged bars are not suitable for incorporation into the fluid end assembly of a hydraulic pump.  Forged bars also often have a configuration ("geometry")[6] that is fully unsuited to the production of fluid end blocks (*e.g.*, where the width can be more than two or three times the height).  Id.

Because of their small cross-sectional dimensions, forged bars are produced on smaller, less powerful forging equipment.  For example, BGH Lippendorf's forging press has a maximum force of only [    ] Meganewtons (MN) compared to the 40 MN forging press used by BGH Siegen.  The manipulator at the BGH Siegen press, which rotates and maneuvers the ingot during forging, also has nearly four times the strength (*i.e.*, "tipping moment")[7] of the manipulator used by BGH Lippendorf.  Section A-C Supplemental Response, App. SA-4, pp. 3-5; P.R. 71, C.R. 44.

BGH Lippendorf's forging press and equipment is simply too small to produce fluid end blocks.  The FEBs sold to the United States have a cross-sectional area of at least [    ] square

---

[6] Configuration or geometry refers to the shape and size of the forging.

[7] The tipping moment is the point at which a manipulator cannot sustain the weight of a forging and will tip forward.  Id.

feet (*i.e.*, width x height).  <u>Section B Response</u>, App. B-4, p. 3; P.R. 44, C.R. 19.  Because of the very high pressures that FEBs must withstand, they require an exacting microstructure and specialized mechanical properties, which necessitates a very high forging reduction rate of at least ([    ]).  This means that the ingot used as the raw material for the forged steel block must be [    ] times larger than the cross-sectional dimensions of the forged steel block.  Moreover, to ensure the exacting microstructure and mechanical properties required of FEBs, the forging/compression of the steel must penetrate all the way through the core of the ingot.  There can be no "dead spaces" in the center of the ingot that have not been compressed and properly deformed.  To achieve this high pressure, intensive core compression on FEBs, a large forging press with a force of at least 40 MN is required.  <u>Id</u>. at pp. 3-4.  BGH Lippendorf's forging equipment cannot fulfill these requirements.

BGH Siegen did not report the sales of forged bar produced by BGH Lippendorf in its normal home market sales file.  Rather, BGH reported these sales in a separate file of "excluded (non-subject) transactions" (bghhm_ns02.sas7bdat) and provided a detailed explanation showing why these products did not meet the definition of products under review.  *See* <u>Section B Response</u>, 9 & App. B-4 to B-5; P.R. 44, C.R. 19.  Nevertheless, Commerce added these transactions to BGH Siegen's home market sales file and used them in its dumping margin calculations.  Because these forged bars do not meet the common meaning of fluid end blocks, they should be excluded from BGH Siegen's home market sales and not used in Commerce's dumping calculations.

Commerce also improperly treated BGH Siegen's home market sales of Military Equipment Blocks and Compounding Machine Blocks as merchandise under review even though these products were produced according to particular customer drawings and specifications for

application in the manufacture of military equipment and plastic extruders and compounding machines.  In its final results, Commerce collectively referred to these products as "customized blocks" and stated that these "customized blocks are in-scope because they meet the physical definition of FEBs provided in the scope description."  IDM, 10; P.R. 99.

In treating these Military Equipment Blocks and Compounding Machine Blocks as merchandise under review, Commerce again gave no effect to the term "fluid end blocks."  BGH Siegen provided specific documentation showing that these Military Equipment Blocks and Compounding Machine Blocks were designed and produced for specific end products unrelated to fluid end blocks or pumps.  Accordingly, these forged blocks do not comport with the common meaning of "fluid end blocks" and thus cannot be considered products under review as defined in the questionnaire.  Therefore, Commerce should have excluded these specific sales of Military Equipment Blocks and Compounding Machine Blocks from the home market sales database when calculating the antidumping duty margin on BGH Siegen's U.S. sales of forged steel fluid end blocks.

The sales of Military Equipment Blocks and Compounding Machine Blocks are easily identified in BGH Siegen's home market sales database.  For each home market transaction involving Military Equipment Blocks and Compounding Machine Blocks, BGH Siegen reported the particular drawing number specified by the customer for each product in the field DRAWINGH.  No other sales in the home market sales database have information reported in the field DRAWINGH.

The Compounding Machine Blocks were all ordered by the customer [

].  As shown by the information submitted by BGH Siegen to Commerce during the administrative review, this customer manufactures plastic extruders and compounding

machines.  Section A-C Supplemental Response, 9-10 & App. SA-6; P.R. 71, C.R. 42 & 45.  The customer drawing submitted by BGH Siegen for a transaction with this customer shows that the product is for [                    ] of a plastic extruding machine.  *See* BGH Section A Questionnaire Response, App. A-8, p. 10 (customer drawing) (May 25, 2023) ("Section A Response"); P.R. 37, C.R. 9.  The drawing shows that the [                ] block is very different in size and configuration from the fluid end blocks sold in the United States.  *Compare* Section A Response, App. A-8, p. 10 (customer drawing) *with* Section A Response, App. A-11, p. 5 (U.S. customer drawing); P.R. 37, C.R. 9 & 11.  The chemical analysis for the [                ] block also requires a minimum amount of [                ], which is not required in fluid end blocks.  *Compare* id. at App A-8, pp. 7 & 18 (customer specification & mill certificate) with id. at App A-11, p. 13 (mill certificate).  The photograph of a completed extruding machine [                ] submitted to Commerce by BGH Siegen further shows that this equipment bears no similarity in design or function to a fluid end block or hydraulic pump.  Section A-C Supplemental Response, App. SA-6, p. 4; P.R. 71, C.R. 45.

The Military Equipment Blocks were all ordered by the customer [                                    ].  As shown by the information submitted by BGH Siegen to Commerce during the administrative review, this customer manufactures specific military equipment such as [                                    ].  Id. at 9 & App. SA-5; P.R. 71, C.R. 42 & 45.  While the specifications and drawings for these products are highly sensitive due to their military nature, BGH Siegen did provide Commerce with an applicable page of the specification under which all of the forgings supplied to this customer are covered.  *See*, id.  Paragraph [

].ˮ  The specification also requires the products to be

manufactured according to [                                    ].  Id. at App. SA-5.

It has therefore been clearly established that none of these products for military use and

the manufacture of machines to produce plastics have any connection to fluid end blocks or

hydraulic pumps.  As such, they do not comport with the common meaning of "fluid end blocks"

and cannot properly be considered products under review as defined in the questionnaire.

Commerce should have therefore excluded these specific sales of Military Equipment Blocks and

Compounding Machine Blocks from the home market sales database when calculating the

antidumping duty margin on BGH's U.S. sales of forged steel fluid end blocks.

Commerce's contention that end-use is irrelevant to its application of the product

description misses the point.  The function and design of a product is always relevant in

determining what the product is.  This is clearly seen by this Court's analysis in *OMG* where the

Court considered whether a certain fastener met the product description of the antidumping and

countervailing duty orders on *Certain Steel Nails from Vietnam*.  In that case, the Court

determined that the plain meaning of the term "nail" was a "slim, usually pointed object used as

a fastener designed for impact insertion." OMG, Inc. v. United States, 321 F. Supp. 3d 1262,

1268-69 (CIT 2018).  The Court then reasoned that the anchor fasteners at issue in that case did

not qualify as "nails" because they were "not inserted by impact into the materials to be

fastened."  Id. at 1269.  This Court thereby overturned Commerce's determination that the

anchor fasteners were within the scope of the orders.  The Court's decision was affirmed on

appeal by the Federal Circuit.  OMG, Inc. v. United States, 972 F.3d 1358 (Fed. Cir. 2020).

Similarly, in *Atkore*, this Court held that Commerce's interpretation of the term "pipe" in

the phrase "certain malleable iron pipe fittings" to include electrical conduit fittings was

unlawful.  Atkore Steel Components, Inc. v. United States, 313 F. Supp. 3d 1374, 1385-86 (CIT 2018).  Although conduit fittings are a type of pipe fitting and otherwise satisfied the physical characteristics described in the scope language, the petition documents showed that the term "pipe" as used in the petition was "designed to . . . withstand pressure and temperature changes typical of oil, gas, or sprinkler applications." Id. at 1385.  Accordingly, the Court interpreted "pipe" as a limiting term that implied certain requirements, such as pressure tolerance, even though those requirements were not explicitly stated in the scope language.

The same type of analysis is relevant to this proceeding.  The plain, common meaning of fluid end blocks is a component of hydraulic pumps.  As in the case of defining nails or pipe, this is a question of design and function.  Forged steel products that are not designed to function as components for hydraulic pumps do not meet the definition of fluid end blocks.

Moreover, it was the ITC, itself, that stressed the issue of end-use during the original injury investigation, and petitioners assured the ITC that unfinished fluid end blocks were "dedicated for eventual use in the fluid end assembly of a hydraulic pump" and that unfinished FEBs were "all sold to pump manufacturers," there being "no separate markets or functions for unfinished FEBs as distinct from finished FEBs."  First Amended AD/CVD Petitions 6 (quoted in BGH Case Brief, 4); P.R. 88, C.R. 84.  Based upon these assurances, the ITC expressly limited its injury determination to finished FEBs and unfinished FEBs "dedicated exclusively to the production of finished FEBs."  The ITC made no injury determination concerning general forged steel products not within the same domestic like product as finished FEBs.

In addition, Commerce relied upon these exact same assurances given to the ITC as the basis for its preliminary and final scope decisions in the original investigation.  In its preliminary scope decision memorandum, Commerce stated:

During the International Trade Commission hearing, the petitioners stated that no opportunity exists to use forged blocks, which meet the "chemistries and configurations" of fluid end blocks, for another purpose and that purchasers sometimes prefer to purchase an unfinished fluid end block and complete varying levels of finishing operations themselves. ***We interpret this statement to mean*** that forged steel blocks meeting the specifications of fluid end blocks, as defined in the scope of the investigations, should be treated as fluid end blocks.

Scope Comments Decision Memorandum for the Preliminary Determinations, 6 (May 18, 2020) (citing ITC Staff Conference Transcript, 53-54) (emphasis added) (Barcode: 3975461-01 (A-428-847 INV - Investigation)).  Commerce quoted this exact same passage in its final scope decision memorandum. *See* Scope Comments Decision Memorandum for the Final Determinations, 5-6 (Dec. 7, 2020) (Barcode: 4064524-01 (A-428-847 INV – Investigation)). Accordingly, Commerce's understanding that any forged steel blocks meeting the physical specifications listed in the product description should be treated as fluid end blocks is based entirely upon petitioners' ITC testimony that no opportunity exists to use forged blocks meeting these physical specifications for any other purpose than the production of finished fluid end blocks.

Thus, the product scope has always been understood as excluding forged steel products that are not designed to function as components for hydraulic pumps and that therefore do not meet the common definition of fluid end blocks.  It is not permissible for Commerce to extend the product scope beyond the limits of the ITC injury determination.  As this Court explained in *Wheatland Tube*:

A fundamental requirement of both U.S. and international law is that an antidumping duty order must be supported by an ITC determination of material injury covering the merchandise in question. . . .  It would follow that any expansion of the scope by Commerce would extend the antidumping duty order beyond the limits of the ITC injury determination and would therefore violate both U.S. and international law.

Wheatland Tube Co. v. United States, 973 F. Supp. 149, 158 (CIT 1997) (citing 19 U.S.C. § 1673 (1994)).

Accordingly, as explained above, Commerce was obliged to determine whether BGH's home market sales of forged bars, Military Equipment Blocks and Compounding Machine Blocks met the common meaning of "fluid end blocks" before treating them as products under review. Commerce failed to make such a determination. The question of whether a product meets the unambiguous scope terms presents a question of fact reviewed for substantial evidence. OMG, Inc. v. United States, 972 F.3d 1358, 1364 (Fed. Cir. 2020). However, Commerce's failure to even make any determination as to whether forged bars, Military Equipment Blocks and Compounding Machine Blocks met the definition of "fluid end blocks" is an error of law.

### C. In the Alternative, Commerce Should Account for the Difference in Product Types in Its Dumping Calculations

As detailed above, home markets sales of forged bars, Military Equipment Blocks and Compounding Machine Blocks do not comport with the common meaning of "fluid end blocks" and thus cannot be considered products under review as defined in the questionnaire. Therefore, Commerce should have excluded the specific home market sales of these products when calculating the antidumping duty margin on BGH Siegen's U.S. sales of forged steel fluid end blocks. In the alternative, when Commerce included home market sales of additional products that were not fluid end blocks in its dumping calculations, it should have accounted for the difference in product types.

Commerce may only treat products as identical if (1) they have no differences in physical characteristics or (2) the differences are only minor and "not commercially significant." Union Steel v. United States, 753 F. Supp. 2d 1317, 1322 (CIT 2011) (citing Pesquera, 266 F.3d at

1382-81 (Fed. Cir. 2001)).  The vehicle used by Commerce to identify identical merchandise is the control number or "CONNUM."  The CONNUM is constructed using a hierarchy of product characteristics (also known as the model-match criteria) identified in the antidumping questionnaire by the fields beginning with the number "3."  Merchandise having the same CONNUM is treated as identical.  Merchandise having different CONNUMs cannot be treated as identical.

It is common practice in steel cases that encompass a range of product types to account for differences in product type and application when comparing products.  An example of this can be seen in the investigations of *Cut-to-Length Plate* from various countries including Germany and Italy.  For example, in these cases, Commerce used as the first model-match criterion the quality of the steel plate (QUALITYH/U), which corresponded to certain general applications such as tool steel, pressure vessel steel, steels designated for transport of petroleum, steels designated for shipbuilding, structural steel, *etc*.  *See* 2022-2023 Administrative Review of the Antidumping Duty Order on Certain Carbon and Alloy Steel Cut-To-Length Plate from Germany: Request for Information, B-10 to B-12 (July 27, 2023) (Barcode: 4407753-01 (A-428-844 REV - Admin Review 5/1/22 - 4/30/23)).  Commerce took this step even though it already had model-match criteria for various chemical elements, such as carbon, chromium, nickel, tungsten, cobalt, molybdenum and vanadium, as well as physical and mechanical properties, such as yield strength, thickness, width and heat treatment.  Id.

It should be noted that even with these detailed quality characteristics, this Court in *Bohler* found that Commerce had still not properly accounted for all commercially significant differences in physical characteristics among the various types of cut-to-length plate products. *See* Bohler Bleche GMBH & Co. KG v. United States, 324 F. Supp. 3d 1344, 1354 (CIT 2018)

("Bohler") (ordering Commerce to "amend its model-match methodology . . . to better account for the commercially significant differences in physical characteristics among Plaintiffs' products"). Similarly, in *Dillinger*, this Court, citing *Bohler*, found that Commerce properly added an additional quality code to the model-match criteria for cut-to-length plate in order to account for petroleum transport plate used in sour service as distinct from standard petroleum transport plate.[8] AG der Dillinger Hüttenwerke v. United States, 672 F. Supp. 3d 1351, 1358 (CIT 2023) ("Dillinger").

In this administrative review, the model-match criteria were designed for one product (*i.e.*, forged steel fluid end blocks) sold to one group of customers (*i.e.*, pump manufacturers). *See* First Amended AD/CVD Petitions 6 (stating "there are no separate markets or functions for unfinished FEBs as distinct from finished FEBs - *i.e.*, they are all sold to pump manufacturers") (quoted in BGH Case Brief, 4); P.R. 88, C.R. 84. Therefore, if Commerce includes home market sales of additional products that are not fluid end blocks in its dumping calculations, it must account for the difference in product types.

For example, BGH Siegen's U.S. sales of forged steel fluid end blocks cannot properly be compared with home market sales of forged bars produced by BGH Lippendorf. As detailed above, forged bars are physically different from fluid end blocks and produced by a different company using different forging equipment that cannot achieve the high pressure, intensive core compression required of FEBs. *See* discussion *supra* pp. 19-20. The FEBs sold to the United States have a cross-sectional area of at least [    ] square feet (*i.e.*, width x height). Section B

---

[8] Sour service refers to steel used to store or transport "sour" crude oil. Crude oil is routinely classified as sweet or sour with reference to the amount of sulfur it contains. Sulfur is extremely corrosive to steel. *See* AG der Dillinger Hüttenwerke v. United States, 648 F. Supp. 3d 1321, 1333-34 (CIT 2023).

<u>Response</u>, App. B-4, p. 3; P.R. 44, C.R. 19.  By contrast, forged bars have a very small cross-sectional dimension with a cross-sectional area of as little as [    ] square feet and in no case more than [    ] square feet (*i.e.*, width x height).  <u>Id</u>. at p.7.  The forged bars are also relatively long in relation to their height and width.  Commerce's model-match criteria, designed as they are exclusively for fluid end blocks, do not adequately account for these physical differences in configuration, core compression and other physical and mechanical properties.

Similarly, BGH Siegen's U.S. sales of forged steel fluid end blocks cannot properly be compared with home market sales of Military Equipment Blocks and Compounding Machine Blocks.  As detailed above, Military Equipment Blocks are produced according to detailed drawings and specifications for [

].  *See* discussion *supra* pp. 22-23.  The development and production process for these Military Equipment Blocks is extremely costly.  As shown by the data from BGH's home market sales file presented in Appendix 1 of this brief, both the weighted-average net price and cost of production of Military Equipment Blocks far exceeded those of any other forged blocks sold in the home market during the period of review.  Moreover, owing to the detailed drawings and specifications for military applications, Military Equipment Block have significant differences in physical/mechanical properties (*e.g.*, size, shape, configuration, *etc*.) in comparison to fluid end blocks.

It is also common practice in steel cases that steels for military applications are excluded from the scope of a proceeding.  Again, the investigations of *Cut-to-Length Plate* from various countries including Germany and Italy serve as an example.  In those investigations, Commerce has excluded military grade armor plate.  <u>Certain Carbon and Alloy Steel Cut-To- Length Plate</u>

from Austria, Belgium, France, the Federal Republic of Germany, Italy, Japan, the Republic of Korea, and Taiwan, 82 Fed. Reg. 24096, 24099-103 (2017) (excluding "military grade armor plate"). In its final results in this review, Commerce attempted to downplay this exclusion of military grade plate by stating that "military grade" was "defined by reference to several recognized international steel specifications." IDM, 8; P.R. 99. However, the same is true in this review. As detailed above, BGH's Military Equipment Blocks are specifically manufactured according to [                              ]. Section A-C Supplemental Response, App. SA-5; P.R. 71, C.R. 45. By contrast, fluid end blocks are not manufactured according to military specifications or designed for use as [                              ]. Therefore, Military Equipment Blocks represent a completely different class or kind of merchandise as compared to fluid end blocks.

Compounding Machine Blocks also have significant differences in physical/mechanical properties (e.g., size, shape, configuration, chemical content, etc.) in comparison to fluid end blocks. As detailed above, Compounding Machine Blocks are produced according to specific customer drawings for the production of plastic extruding machines. See discussion supra pp. 21-22. These blocks are very different in size and configuration from the fluid end blocks sold in the United States and contain additional alloys such as [        ]. Id. Moreover, as shown by the data from BGH's home market sales file presented in Appendix 1 of this brief, both the weighted-average net price and cost of production of Compounding Machine Blocks are well outside the range of other forged blocks sold in the home market during the period of review.

Accordingly, home market sales of forged bars, Military Equipment Blocks and Compounding Machine Blocks are not comparable to BGH's U.S. sales of fluid end blocks, and

Commerce erred when it included sales of these products in its margin calculations (including the calculation of constructed value and CV profit).

## V.    Conclusion and Prayer for Relief

For the reasons stated above, Commerce's final results are not supported by substantial evidence on the administrative record or in accordance with the law or other applicable legal standards.  We therefore respectfully request that the Court remand this case to Commerce for redetermination with instructions consistent with the arguments set forth above and grant BGH such other further relief as the Court may deem appropriate.

Respectfully submitted,

/s/ Marc E. Montalbine
Marc E. Montalbine*
J. Kevin Horgan
Merisa A. Horgan
**DEKIEFFER & HORGAN, PLLC**
1015 Fifteenth Street, N.W.
6th Floor
Washington, DC 20005
Tel: (202) 783-6900
Fax: (202) 783-6909
email:  montalbine@dhlaw.de

Date: March 17, 2025    *Counsel to BGH Edelstahl Siegen GmbH*

--------------------

* Admitted to Virginia Bar; practice limited to Federal International Trade Matters pursuant to D.C. Bar Rule 49(c)(2).

**PUBLIC VERSION**

Appendix 1

**Comparison of Weighted-Average Home Market Net Price (HMNETPR) and
Weighted-Average Total Cost of Production (TOTCOP)**

**By Home Market Customer**

| Customer Code (CUSCODH) | Wtd. Avg. HM Net Price (EUR/kg) | Wtd. Avg. Total Cost of Production (EUR/kg) |
|---|---|---|
| [ | | ] |
| [ | | ] |
| [ | | ] |
| [ | | ] |
| [ | | ] |
| [ | | ] |

Source: Home Market Sales File bghhm02.sas7bdat

**Word Count Certificate of Compliance**

This brief has been prepared utilizing Word for Microsoft 365 using a proportionally spaced typeface (12 point Times New Roman font).

In accordance with the Chambers Procedures of this Court, the undersigned certifies that this brief complies with the word limitations set forth in the amended scheduling order dated February 19, 2025 (ECF No. 24).  Specifically, excluding those exempted portions of the brief, as set forth in section 2(B)(1) of the Chambers Procedures, I hereby certify that this brief contains **9,070** words.  In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

<div style="margin-left: 40%;">

/s/ Marc E. Montalbine
Marc E. Montalbine*
**DEKIEFFER & HORGAN, PLLC**
1015 Fifteenth Street, N.W.
6th Floor
Washington, DC 20005
Tel: (202) 783-6900
Fax: (202) 783-6909
email:  montalbine@dhlaw.de
*Counsel to BGH Edelstahl Siegen GmbH*

</div>

Date: March 17, 2025

---

\* Admitted to Virginia Bar; practice limited to Federal International Trade Matters pursuant to D.C. Bar Rule 49(c)(2).