**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE MARK A. BARNETT, CHIEF JUDGE

| | |
|---|---|
| BGH EDELSTAHL SIEGEN GMbH, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Court No. 24-00176 |
| ) | |
| UNITED STATES, ) | |
| ) | |
| Defendant, ) | |

**DEFENDANT'S RESPONSE TO EDELSTAHL'S
MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

YAAKOV M. ROTH
Acting Assistant Attorney
General

PATRICIA M. McCARTHY
Director

FRANKLIN E. WHITE, JR.
Assistant Director

OF COUNSEL:

DANIELLE COSSSEY
Attorney
Office of the Chief Counsel
  for Trade Enforcement and Compliance
United States Department of Commerce

STEPHEN C. TOSINI
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20004
Telephone: (202) 616-5196
Facsimile: (202) 514-7969
E-mail: stephen.tosini@usdoj.gov

May 15, 2025

Attorneys for defendant

## **TABLE OF CONTENTS**

STATEMENT PURSUANT TO RULE 56.2 ................................................................2

    I.     Administrative Determination Under Review ...........................................2

    II.    Issues Presented For Review ...................................................................2

STATEMENT OF FACTS ...................................................................................2

SUMMARY OF THE ARGUMENT .....................................................................8

ARGUMENT .....................................................................................................9

    I.     Standard Of Review .................................................................................9

    II.    Legal Framework ...................................................................................10

    III.   Commerce's Treatment Of "Bars" And "Custom Blocks" As Identical Foreign
         Like Product Is Supported By Substantial Evidence ...............................11

    IV.   Edelstahl Failed To Exhaust Administrative Remedies With Respect To Home
         Market Sales Adjustments Rather Than Exclusions ...............................16

CONCLUSION ...............................................................................................20

## TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Ag Der Dillinger Huttenwerke v. United States*,
   No. 1:17-cv-00158 (Ct. Int'l Trade 2021)................................................................ 19

*Altx, Inc. v. United States*,
   370 F.3d 1108 (Fed. Cir. 2004) ............................................................................... 9

*ArcelorMittal Stainless Belgium N.V. v. United States*,
   694 F.3d 82 (Fed. Cir. 2012)............................................................................ 14, 16

*Atl. Sugar, Ltd. v. United States*,
   744 F.2d 1556 (Fed. Cir. 1984) ............................................................................... 9

*Boomerang Tube LLC v. United States*,
   856 F.3d 908 (Fed. Cir. 2017).............................................................................. 17

*Bostock v. Clayton County*,
   590 U.S. 644 (2020) ............................................................................................. 16

*Consolo v. Fed. Mar. Comm'n*,
   383 U.S. 607 (1966) ............................................................................................... 9

*Corus Staal BV v. U.S.*,
   502 F.3d 1370 (Fed. Cir. 2007) ............................................................................. 17

*Fagersta Stainless AB v. United States*,
   577 F.Supp.2d 1270 (Ct. Int'l Trade 2008)............................................................ 19

*Fujitsu Gen. Ltd. v. United States*,
   88 F.3d 1034 (Fed. Cir. 1996) ................................................................................. 9

*Gerber Food (Yunnan) Co. v. United States*,
   601 F. Supp. 2d 1370 (Ct. Int'l Trade 2009)......................................................... 17

*Hitachi Metals, Ltd. v. United States*,
   949 F.3d 710 (Fed. Cir. 2020)................................................................................. 9

*JTEKT Corp. v. United States*,
   37 F. Supp. 3d 1326 (Ct. Int'l Trade 2014) .......................................................... 18

*King Supply Co., LLC v. United States*,
   674 F.3d 1343 (Fed. Cir. 2012)................................................................... 7, 12, 13

*Koyo Seiko Co. v. United States*,
    66 F.3d 1204 (Fed. Cir. 1995) ............................................................... 11

*La Molisana S.p.A. v. United States*,
    633 F.Supp.3d 1266 (Ct. Int'l Trade 2023) ...................................... 11, 19

*Manchester Tank & Equip. Co. v. United States*,
    483 F. Supp. 3d 1309 (Ct. Int'l Trade 2020) ......................................... 19

*Nippon Steel Corp. v. United States*,
    458 F.3d 1345 (Fed. Cir. 2006) ................................................................. 9

*OMG, Inc. v. United States*,
    972 F.3d 1358 (Fed. Cir. 2020) ......................................................... 14, 15

*PAM, S.p.A. v. United States*,
    582 F.3d 1336 (Fed. Cir. 2009) ................................................................. 9

*Pesquera Mares Australes Ltda v. United States*,
    266 F.3d 1372 (Fed. Cir. 2001) ............................................................... 11

*Sandvik Steel Co. v. United States*,
    164 F.3d 596 (Fed. Cir. 1998) ................................................................. 17

*SKF USA Inc. v. United States*,
    263 F.3d 1369 (Fed. Cir. 2001) ............................................................... 11

*SmithKline Beecham Corp. v. Apotex Corp.*,
    439 F.3d 1312 (Fed. Cir. 2006) ............................................................... 20

*Stanley Works (Langfang) Fastening Sys. Co., Ltd. v. United States*,
    279 F. Supp. 3d 1172 (Ct. Int'l Trade 2017) .......................................... 17

*United States v. Eurodif S.A.*,
    555 U.S. 305 (2009) ................................................................................... 9

*Vandewater International Inc. v. United States*,
    589 F.Supp.3d 1324 (Ct. Int'l Trade Sept. 8, 2022) ............................... 14

**Statutes**

19 U.S.C. § 1516a(b) ....................................................................................... 9

19 U.S.C. § 1677(16) ............................................................................. *passim*

19 U.S.C. § 1677(25) ........................................................................................... 10, 15

19 U.S.C. § 1677b(a) ............................................................................................... 10

28 U.S.C. § 2637(d) ................................................................................................. 17

## Regulations

19 C.F.R. 351.309 ................................................................................................... 17

## Administrative Determinations

*Certain Carbon and Alloy Steel Cut-to-Length Plate from Austria, Belgium, France, the Federal Republic of Germany, Italy, Japan, the Republic of Korea and Taiwan,*
   82 Fed. Reg. 24,096 (Dep't of Commerce May 25, 2017) ....................................... 16

*Forged Steel Fluid End Blocks from Germany: Final Results of the Antidumping Duty Administrative Review; 2022,*
   89 Fed. Reg. 67,072 (Dep't of Commerce Aug. 19, 2024)........................................ 2

*Forged Steel Fluid End Blocks from the Federal Republic of Germany and Italy: Amended Final Antidumping Duty Determination of the Federal Republic of Germany and Antidumping Duty Orders,*
   86 Fed. Reg. 7,528 (Dep't of Commerce Jan. 29, 2021) ................................................. *passim*

*Honey from Argentina: Final Results of Antidumping Duty Administrative Review,*
   69 Fed. Reg. 30282 (Dep't Commerce May 27, 2004)............................................ 18

*Initiation of Antidumping and Countervailing Duty Administrative Reviews,*
   88 Fed. Reg. 15,642 (Dep't of Commerce Mar. 14, 2023) ....................................... 4

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE MARK A. BARNETT, CHIEF JUDGE

| | |
|---|---|
| BGH EDELSTAHL SIEGEN GMbH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Court No. 24-00176 |
| | ) |
| UNITED STATES, | ) |
| | ) |
| Defendant, | ) |

**DEFENDANT'S RESPONSE TO EDELSTAHL'S**
**MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

Defendant, the United States, respectfully responds to the motion for judgment on the

administrative record filed by Edelstahl Siegen GMbH (Edelstahl), challenging the Department

of Commerce's (Commerce) final results of the 2022 administrative review of the antidumping

duty order on forged steel fluid end blocks from Germany.  In this antidumping duty case,

Commerce calculated the rate of dumping by comparing Edelstahl's United States and home

market prices for identical products, as the statute directs.  Edelstahl does not contest the fact that

Commerce followed Congress's statutory mandate for determining foreign like product, 19

U.S.C. § 1677(16), when conducting its antidumping duty calculation.  Indeed, it neglects to cite

section 1677(16) despite the fact that Commerce cited it eight times in its short issues and

decision memorandum (IDM).  P.R. 99.  Nor does Edelstahl contest that all of the sales that

Commerce used to compare with Edelstahl's United States sales met the physical description of

identical merchandise under that statute.  Instead, Edelstahl attempts to engraft an unsupported

end-use requirement onto the scope of the order because, according to Edelstahl, its products

"have a totally different name."  This cannot overcome the order's expansive scope that, by its

own terms, explicitly includes forged steel articles exceeding Edelstahl's constricted definition of fluid end blocks, let alone binding appellate precedent establishing the same. Accordingly, the Court should sustain the final results.

## STATEMENT PURSUANT TO RULE 56.2

### I.    Administrative Determination Under Review

Edelstahl challenges certain aspects of Commerce's administrative review of the antidumping duty order on forged steel fluid end blocks from Germany. The period of review is January 1, 2022 through December 31, 2022. Commerce's conclusions are set forth in *Forged Steel Fluid End Blocks from Germany: Final Results of the Antidumping Duty Administrative Review; 2022*, 89 Fed. Reg. 67,072 (Dep't of Commerce Aug. 19, 2024), and the accompanying IDM.

### II.    Issues Presented For Review

(1) Whether Commerce's decision to treat certain forged steel products as foreign like product included in the home market sales to calculate normal value is supported by substantial evidence and otherwise in accordance with law; and

(2) Whether Edelstahl failed to exhaust administrative remedies with respect to its count seeking certain adjustments where it failed to raise this issue administratively.

### STATEMENT OF FACTS

Commerce issued an antidumping duty order covering forged steel fluid end blocks from Germany. *Forged Steel Fluid End Blocks from the Federal Republic of Germany and Italy: Amended Final Antidumping Duty Determination of the Federal Republic of Germany and Antidumping Duty Orders*, 86 Fed. Reg. 7,528, 7,530 (Dep't of Commerce Jan. 29, 2021) (*Order*). The scope, in its entirety, defined "fluid end blocks" to mean:

The products under review are forged steel fluid end blocks (fluid end blocks), whether in finished or unfinished form, and which are typically used in the manufacture or service of hydraulic pumps.

The term "forged" is an industry term used to describe the grain texture of steel resulting from the application of localized compressive force. Illustrative forging standards include, but are not limited to, American Society for Testing and Materials (ASTM) specifications A668 and A788.

For purposes of these orders, the term "steel" denotes metal containing the following chemical elements, by weight: (i) Iron greater than or equal to 60 percent; (ii) nickel less than or equal to 8.5 percent; (iii) copper less than or equal to 6 percent; (iv) chromium greater than or equal to 0.4 percent, but less than or equal to 20 percent; and (v) molybdenum greater than or equal to 0.15 percent, but less than or equal to 3 percent. Illustrative steel standards include, but are not limited to, American Iron and Steel Institute (AISI) or Society of Automotive Engineers (SAE) grades 4130, 4135, 4140, 4320, 4330, 4340, 8630, 15-5, 17-4, F6NM, F22, F60, and XM25, as well as modified varieties of these grades.

The products covered by these orders are: (1) Cut-to-length fluid end blocks with an actual height (measured from its highest point) of 8 inches (203.2 mm) to 40 inches (1,016.0 mm), an actual width (measured from its widest point) of 8 inches (203.2 mm) to 40 inches (1,016.0 mm), and an actual length (measured from its longest point) of 11 inches (279.4 mm) to 75 inches (1,905.0 mm); and (2) strings of fluid end blocks with an actual height (measured from its highest point) of 8 inches (203.2 mm) to 40 inches (1,016.0 mm), an actual width (measured from its widest point) of 8 inches (203.2 mm) to 40 inches (1,016.0 mm), and an actual length (measured from its longest point) up to 360 inches (9,144.0 mm).

The products included in the scope of these orders have a tensile strength of at least 70 KSI (measured in accordance with ASTM A370) and a hardness of at least 140 HBW (measured in accordance with ASTM E10).

A fluid end block may be imported in finished condition (*i.e.*, ready for incorporation into a pump fluid end assembly without further finishing operations) or unfinished condition (*i.e.*, forged but still requiring one or more finishing operations before it is ready for incorporation into a pump fluid end assembly). Such finishing operations may include: (1) Heat treating; (2) milling one or more flat surfaces; (3) contour machining to custom shapes or dimensions; (4) drilling or boring holes; (5) threading holes; and/or (6) painting, varnishing, or coating.

Excluded from the scope of these orders are fluid end block assemblies which (1) include (a) plungers and related housings, adapters, gaskets,

3

seals, and packing nuts, (b) valves and related seats, springs, seals, and
cover nuts, and (c) a discharge flange and related seals, and (2) are
otherwise ready to be mated with the "power end" of a hydraulic pump
without the need for installation of any plunger, valve, or discharge flange
components, or any other further manufacturing operations.

The products included in the scope of these orders may enter under
Harmonized Tariff Schedule of the United States (HTSUS) subheadings
7218.91.0030, 7218.99.0030, 7224.90.0015, 7224.90.0045, 7326.19.0010,
7326.90.8688, or 8413.91.9055.  While these HTSUS subheadings are
provided for convenience and customs purposes, the written description of
the scope of the orders is dispositive.

*Id*. at 7,530 (Appendix).

Commerce initiated the second administrative review of the antidumping duty order in

2023.  *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 88 Fed. Reg.

15,642 (Dep't of Commerce Mar. 14, 2023).  Commerce selected Edelstahl for individual

examination and requested that it report sales and cost data for "merchandise under review"

defined as "all products within the scope" of the order.  Initial Questionnaire (P.R. 24) at 19.  In

reporting its home market sales, Edelstahl segregated certain sales that it contended should be

excluded from the normal value calculation, despite meeting the physical requirements of the

scope.  First, Edelstahl attempted to remove fluid end "bars" from the home market sales by

submitting a "Non-Subject Sales" database separately from the "Home Market Sales" database.

Section B Response (P.R. 44. C.R. 19) at Appx B-4.  In its questionnaire response and pre-

preliminary comments, Edelstahl further maintained that the separate file of "excluded (non-

subject) transactions" are not subject merchandise because they are forged end "bars" rather than

fluid end blocks.  Edelstahl Pre-Preliminary Comments (P.R. 73, C.R. 60).  These bars, it

asserted, are produced by Edelstahl's affiliate and, although meeting the physical requirements of

the scope, they do not meet the definition of fluid end blocks because they purportedly have

"very different geometries" and are not dedicated for use in the fluid end assembly of hydraulic pumps. *Id*.

Additionally, when reporting home market sales, Edelstahl noted that sales to certain customers for use in military equipment as well as plastic extruders and compounding machines (custom blocks) are identified by the customer-specific "drawing number" listed in the database. Edelstahl Section A-C Supplemental Response (P.R. 71, C.R. 42) at 8-10.  In the pre-preliminary comments Edelstahl sought to exclude those sales from the universe of home market sales. Edelstahl Pre-Preliminary Comments (P.R. 73, C.R. 60) at 3-4 (maintaining that those sales were made "according to specific customer drawings" and "none of these products for military use and the manufacture of machines to produce plastics have any connection to fluid end blocks and therefore should be excluded from the home market sales database.")

Ellwood City Forge Co., *et. al.*, (Ellwood) objected to Edelstahl's segregation of its home market sales, explaining that "Commerce relies upon the physical characteristics of the product—and not the end use—to determine whether a product falls within the scope," and thus, Edelstahl should clarify "whether its purportedly non-scope products in fact meet the physical characteristics of the scope definition."  Ellwood Deficiency Comments (P.R. 59, C.R. 39). Ellwood also commented that Commerce should include all home market sales that are expressly covered by the physical description of the scope language and the scope does not exclude products based on end use.  Ellwood Pre-Preliminary Comments (P.R. 75, C.R. 61).

Commerce explained in its preliminary results that, "if there are no home market sales of identical merchandise" then it would base normal value on home market prices of the product "that is the most similar to the product sold in the U.S. market."  *Prelim. Decision Memorandum* (P.R. 84) at 7-8.  Commerce then identified the following 18 physical characteristics that

Edelstahl had reported and explained that it would use them to determine foreign like products

that are identical or similar to the subject merchandise:

> (1) chromium content, (2) nickel content, (3) copper content, (4) molybdenum content, (5) minimum specified tensile strength, (6) size, (7) length, (8) machining, (9) bores, (10) normalized heat treatment, (11) austenitized heat treatment, (12) annealed heat treatment, (13) solution annealed heat treatment, (14) tempered heat treatment, (15) age hardened heat treatment, (16) quenched heat treatment, (17) coating, and (18) parts.

*Id*.

Commerce rejected Edelstahl's contention that forged steel "bars" are not fluid end

blocks because "neither the scope of {the} *Order* nor the physical characteristics used for

matching purposes refer to 'geometrics' or to the end use of the product."  *Id*.  Commerce noted

that Edelstahl "does not claim that these products fall outside the scope of this review in terms of

the physical characteristics referenced in the scope description."  *Id*.  Thus, "{i}n accordance

with {19 U.S.C. § 1677(16)}, {Commerce} considered all products produced or sold by the

respondents in Germany during the {period of review} that fit the description {of the scope of

the *Order*}, to be foreign like products for purposes of determining {normal value} for

comparison to U.S. sales prices."  Preliminary Decision Memorandum (P.R. 84) at 7-8.

Edelstahl reiterated its end-use arguments in its case brief.  Edelstahl Case Brief (P.R. 88,

C.R. 84).  Edelstahl first urged Commerce to exclude products meeting the physical description

of the scope, but that Edelstahl claimed are nevertheless not fluid end blocks.  *Id*.  Second,

Edelstahl suggested that Commerce exclude the home market sales to two customers from the

normal value calculation because those sales are "not designed for use as {fluid end blocks} as

evidenced by the specific customer drawings and specifications." *Id*.  Edelstahl did not object to

Commerce's selection of the 18 physical characteristics for comparison purposes, nor did it

6

contend that the agency should adjust prices for its purported non-fluid end block home market

sales. *Id*.

Commerce held a public hearing in response to Edelstahl's request.  Transcript (P.R. 97)

at 16-19.  During the hearing, Edelstahl was unable to identify physical characteristics to

examine to distinguish the between its suggested categories of merchandise:

> Commerce: "if the products are so different…there's not a way to identify
> them physically, that instead we have to just kind of rely on Edelstahl's
> word as to what is intended for this product… you haven't explained
> anywhere on the record, unless I've missed it, how we could actually look
> at this product and determine that it is a separate product that could not be
> used… as a fluid end block."
>
> Counsel: "… for the specifically designed, you have the drawing numbers.
> You could go through each drawing… specifications are on the record for
> the one."
>
> Commerce: "*How would I know that they're not unfinished fluid end
> blocks*?"
>
> Counsel: "*Well*, *they have a totally different name.*  It tells you what it's
> going to."
>
> Commerce: "There's no physical characteristic I can look at?"
>
> Counsel: "Well, the problem is that *the physical characteristics in the
> scope are very, very broad. And so you'd have to get into other things*.
> Like, production ratio is a key thing. That's not on the record, other
> elements that are not part of the record. So that part is, if the language is
> over-broad, but the intent is clear from all the documents, they only
> wanted unfinished fluid end-blocks, then you go through the K
> documentation and say, okay, was this meant to be in there?"

*Id*. (emphasis added).

In its final results, Commerce continued to treat all reported home market sales that were

identical to the physical description of the scope as foreign like product under 19 U.S.C.

§ 1677(16)(A).  Commerce noted that Edelstahl's arguments merely reiterated its earlier end use

arguments, finding "no reason to reverse this conclusion for the final results."  IDM at 6.

Commerce further added that the scope "does not require" products to have an end use in the manufacture or service of hydraulic pumps and that end-use restrictions must use clear exclusionary language. *Id*. at 5-8 (quoting *King Supply Co., LLC v. United States*, 674 F.3d 1343, 1348 (Fed. Cir. 2012)).

Commerce also explained that "the language of the scope description itself is dispositive" so there was no need to examine extrinsic evidence such as International Trade Commission (ITC) reports and transcripts. *Id*. In support, Commerce contrasted its decision with other decisions in which "Commerce found the scope language *not* dispositive" and thus relied on secondary information such as ITC reports and the petition. *Id*. Commerce thus continued to find that Edelstahl's fluid end bars and custom blocks are identical foreign like products pursuant to 19 U.S.C. § 1677(16)(A).

## SUMMARY OF THE ARGUMENT

Commerce's determination that fluid end bars and custom blocks are foreign like product is supported by substantial evidence and in accordance with law. Commerce compared products that Edelstahl sold in the home market to the physical criteria identified in the scope of the *Order*. Finding that Edelstahl's products matched the *Order's* physical scope criteria (including chemical composition, size, tensile strength, and hardness) and that the scope's plain language lacks any end-use exclusion, Commerce included all reported home market sales in its normal value calculation as foreign like product. Edelstahl's attempt to engraft an end-use requirement onto the scope is unavailing because such limitations must have clear exclusionary language and leave no reasonable doubt of the intention of the exclusion.

Finally, Edelstahl failed to exhaust its new argument that Commerce should have adjusted its home market sales to account for purported product differences, and no exception to the exhaustion doctrine apples.

## ARGUMENT

### I.    Standard Of Review

In reviewing Commerce's antidumping and countervailing duty determinations, "the Court of International Trade must sustain 'any determination, finding or conclusion found' by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with the law.'" *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)).  "The specific factual findings on which {Commerce} relies in applying its interpretation are conclusive unless unsupported by substantial evidence." *United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009).  Substantial evidence means "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *PAM, S.p.A. v. United States*, 582 F.3d 1336, 1339 (Fed. Cir. 2009).  Even if the Court may draw two inconsistent conclusions from the record evidence, that possibility "does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966). Accordingly, reviewing courts "must affirm {Commerce's} determination if it is reasonable and supported by the record as a whole, even if some evidence detracts from {Commerce's} conclusion." *Hitachi Metals, Ltd. v. United States*, 949 F.3d 710, 716 (Fed. Cir. 2020) (quoting *Altx, Inc. v. United States*, 370 F.3d 1108, 1121 (Fed. Cir. 2004)).

Under the substantial evidence standard, Edelstahl "has chosen a course with a high barrier to reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006)

(citation omitted), and the Court will sustain Commerce's factual determinations as long as they are reasonable and supported by the record as a whole, even if some evidence detracts from them. *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).

## II.    Legal Framework

Commerce determines whether the subject merchandise is being sold, or is likely to be sold, at less than fair value by comparing the export (or constructed export) price with the normal value of the product. 19 U.S.C. § 1677b(a). Normal value is based on the "price at which the foreign like product is sold for consumption in the exporting country." 19 U.S.C. § 1677b(a)(1)(B).

"Foreign like product" is defined as merchandise "in the first of the following categories":

> (A) The subject merchandise and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, that merchandise.

> (B) Merchandise—(i) produced in the same country and by the same person as the subject merchandise, (ii) like that merchandise in component material or materials and in the purposes for which used, and (iii) approximately equal in commercial value to that merchandise.

> (C) Merchandise—(i) produced in the same country and by the same person and of the same general class or kind as the merchandise which is the subject of the investigation, (ii) like that merchandise in the purposes for which used, and (iii) which the administering authority determines may reasonably be compared with that merchandise.

19 U.S.C. § 1677(16). Thus, foreign like product is merchandise that is either identical to, or similar to, subject merchandise, according to a hierarchy of characteristics. Subject merchandise is, in relevant part, "merchandise that is within the scope of . . . a review." 19 U.S.C. § 1677(25). Thus, "foreign like product" is merchandise that is either identical to, or similar to the scope of an order. 19 U.S.C. § 1677(16).

10

Commerce determined that Edelstahl's foreign sales met the standard for "identical" merchandise under 19 U.S.C. § 1677(16)(A) and thus did not reach the question of whether the products at issue would fall under (B) or (C).  IDM at 8 n.29.

The statute does not provide a standardized methodology for identifying identical or similar merchandise.  Thus, Commerce possesses "considerable discretion in defining 'foreign like product.'"  *SKF USA Inc. v. United States*, 263 F.3d 1369, 1381 (Fed. Cir. 2001). Merchandise "should be considered to be identical despite the existence of minor differences in physical characteristics, if those minor differences are not commercially significant."  *La Molisana S.p.A. v. United States*, 633 F.Supp.3d 1266, 1271 (Ct. Int'l Trade 2023) (quoting *Pesquera Mares Australes Ltda v. United States*, 266 F.3d 1372, 1384 (Fed. Cir. 2001)).

To ensure that the merchandise sold in the United States market is being compared "with a suitable home-market product," Commerce establishes a model match hierarchy and requires respondents to report sales in accordance with these criteria.  *Koyo Seiko Co. v. United States*, 66 F.3d 1204, 1209 (Fed. Cir. 1995); *see also* 19 U.S.C. § 1677(16)(C)(iii).  This hierarchy of characteristics is used to create a control number, or CONNUM, for each unique product. CONNUMs are comprised of digits, and each digit is a "code" for a physical characteristic of the product.  *La Molisana*, 633 F.Supp.3d at 1269.

## III.    Commerce's Treatment Of "Bars" And "Custom Blocks" As Identical Foreign Like Product Is Supported By Substantial Evidence

Commerce's finding that the fluid end bars and custom blocks were identical to the scope of the *Order,* and consequently included in the normal value calculation is supported by substantial evidence because it is based on the plain language of the scope's physical criteria under 19 U.S.C. § 1677(16)(A).

The scope covers "fluid end blocks, whether in finished or unfinished form, and which are *typically* used in the manufacture or service of hydraulic pumps." *Order*, 86 Fed. Reg. at 7,530 (emphasis added). The use of the fluid end block in the manufacture or service of hydraulic pumps is described as *typical* - not required. IDM at 7-8. The scope's phrase "typically used" necessarily means that the scope includes merchandise that is *not used* for pumps. Indeed, the scope's qualified language – "are typically used" – is not as strong as the language – "are used" – that the Court of Appeals for the Federal Circuit held did not indicate an end-use exclusion in *King Supply*, 674 F.3d at 1349. There, the Court explained that "the phrase 'are used' alone does not compel a reading of an exclusive end-use, and it does not render a reading of an exemplary use unreasonable or outside the scope of Commerce's broad authority to interpret its own {antidumping} orders." *Id*.

The scope further specifies definitions for "forged" and "steel" as well as the chemical elements, by weight, of steel that applies. *Order*, 86 Fed. Reg. at 7,530. Edelstahl does not dispute that its "fluid end bars" and "custom blocks" are forged steel and fit within the specified forged and steel specifications outlined in the scope. *See*, *e.g.*, Pl. Br. at 3-4, 6-7, 11. The scope then sets forth the "actual height (measured from its highest point)," the "actual width (measured from its widest point)," and the "actual length (measured from its longest point)" for both cut-to-length fluid end blocks and strings of fluid end blocks that are covered, as well as the tensile strength and hardness of the product. *Order*, 86 Fed. Reg. at 7,530. Once again, there is no dispute and all parties agree that fluid end bars and custom blocks have these specifically defined physical characteristics. Pl. Br. at 3-4, 6-7, 11; *see also King Supply*, 674 F.3d at 1348 ("Because King's pipe fittings satisfy the physical characteristics of the pipe fittings in the {antidumping order}, and because the {antidumping order} was reasonably interpreted by

12

Commerce to include no end-use restrictions, Commerce's Scope Ruling was supported by substantial evidence and the Trade Court erred by substituting its interpretation of the {antidumping order} for that of Commerce"). Thus, Commerce permissibly found that the fluid end bars and custom blocks are identical with the plain language of the scope and therefore constitute foreign like product. IDM at 7-8.

In sum, Edelstahl's attempt to inject an end use requirement into the scope cannot overcome the Federal Circuit's binding directive that "end-use restrictions do not apply to {antidumping} orders unless the {antidumping} order at issue includes clear exclusionary language" and that it "must leave no reasonable doubt that certain products were intended to be outside the scope of the {antidumping} order based solely on the end use of those products." *King Supply*, 674 F.3d at 1349. Edelstahl makes no attempt to distinguish *King Supply* and, indeed, only cites it in passing with respect to a wholly unrelated issue. Pl. Br. at 18.

As explained above, the scope lacks any "clear exclusionary language" that "leaves no reasonable doubt." *King Supply*, 674 F.3d at 1349. The scope merely states that forged end blocks are "*typically* used in the manufacture or service of hydraulic pumps" which specifically contemplates that sometimes they are not. *Order*, 86 Fed. Reg. at 7,530. Moreover, Commerce explained that there are "no identifiable physical distinctions between fluid end blocks and bars and custom blocks in this case" and that "Edelstahl confirmed during the hearing for this review, there is no way to identify the products at issue physically." IDM at 7-8. And this would make end-use requirements difficult to enforce. *Id*.; *see also King Supply*, 674 F.3d at 1348 (explaining that end use restrictions are disfavored because "they can be difficult to enforce").

Edelstahl nevertheless attempts to evade the lack of a clear end-use specification. It contends that "fluid end blocks" is ambiguous, so Commerce must rely on Edelstahl's proffered

"plain, common meaning" of 'fluid end blocks,' which requires the fluid end blocks to be used as part of a hydraulic fluid power pump.  Pl. Br. at 9.  To support its "plain, common" definition of fluid end blocks, Edelstahl first relies on the definition of HTSUS 8413.91.9055 as well as the ITC report in attempting to demonstrate an end-use requirement.  Pl. Br. at 9.  However, as Commerce explained, because the "language of the scope description itself is dispositive, there is no need to resort to an examination of the other documentation cited by Edelstahl."  IDM at 7 n.17; *see also OMG, Inc. v. United States*, 972 F.3d 1358, 1363 (Fed. Cir. 2020) (*OMG*) (citing *ArcelorMittal Stainless Belgium N.V. v. United States*, 694 F.3d 82, 87 (Fed. Cir. 2012)) ("'[T]he first step in a scope ruling proceeding is to determine whether the governing language is in fact ambiguous. . . .  If it is not ambiguous, the plain meaning of the language governs."").  Furthermore, there are multiple HTSUS codes contained within the scope language, all of which are described as being "provided for convenience and customs purposes, the written description of the scope of the *Order* is dispositive."  Final IDM at 3; *see also Vandewater International Inc. v. United States*, 589 F. Supp.3d 1324, 1337 (Ct. Int'l Trade Sept. 8, 2022) (upholding Commerce's determination that HTSUS classifications were "insufficient" in comparison to an inquiry into the "physical characteristics" of the merchandise).

    In fact, Edelstahl's attempt, Pl. Br. 9, to define fluid end blocks as limited to products within HTSUS 8413.91.9055 defeats its case because the scope itself includes numerous other illustrative subheadings, which it ignores.  *Order*, 86 Fed. Reg. at 7,530.

    Edelstahl's reliance on *OMG* for the contention that "the product description must be understood as applying the plain, common meaning of "fluid end blocks" is also misplaced.  Pl. Br. at 9.  Despite Edelstahl's contrary contention, in *OMG*, the Federal Circuit did not define the language of the scope based on the plain meaning of the term "nail" because it found the scope

14

language unambiguous. Instead, the Court found ambiguity in the product under consideration. *OMG*, 972 F.3d at 1364 (considering "ambiguity in the context of the merchandise at issue in this case" and agreeing with this Court and the Government that "the scope language 'nails . . . constructed of two or more pieces' is unambiguous in this context"). The reason, in part, the language of the scope was unambiguous is that "{n}o Party appears to dispute that for purposes of the {o}rders, 'nails' are fasteners designed for impact insertion." *Id*. Thus, the Court reasoned that, "unlike nails," OMG's anchors are "not designed for impact insertion." *Id*. This stands in sharp contrast to the question here, where Edelstahl contends that fluid end blocks must be designed for pump manufacturers based on nothing more than a name.

Edelstahl further contends that sales of its affiliate should be excluded "because of the small cross-sectional dimension, forged bars are not suitable for incorporation into the fluid end assembly of a hydraulic pump" and because certain sales were customized for certain purposes other than hydraulic pumps ("for use in the manufacture of specific military equipment" and "for use in the manufacture of plastic extruders and compounding machines"). Pl. Br. at 3-4; 8. Once again, Edelstahl's argument stems from the erroneous assumption that fluid-end blocks require a specific end use.

And Edelstahl's contention that "fluid end blocks" are "not otherwise defined" in the scope fails to appreciate that the definition "fluid end blocks" for purposes of antidumping duties, is the scope. 19 U.S.C. § 1677(25) ("'subject merchandise' means the class or kind of merchandise that is within the scope of an investigation."). Because every scope first identifies the product which it defines (*e.g.* "fluid end blocks"), claiming that the term of the product itself is ambiguous would mean that the language of every scope is ambiguous. By Edelstahl's logic, the starting place for every analysis of the scope language would start with supporting

documentation to figure out what the product is (based solely on some "common, plain" definition), rather than the scope language itself.  Indeed, Edelstahl encourages Commerce to look at the physical aspects outside the scope (*e.g.* "configuration (geometry)") rather than those that are expressly identified in the scope language (height, length, width, chemical composition, etc.).  Pl. Br. at 22.  This controverts the requirement that "the plain meaning of the language governs."  *ArcelorMittal Stainless Belgium*, 694 F.3d at 87.

In a final effort to claim another exclusion at the end of their case brief, Edelstahl cites the *CTL Plate Order* to contend that it "is also common practice in steel cases that steel military applications are excluded from the scope of a proceeding" and that they represent a completely different class or kind of merchandise.  Pl. Br. at 20-30 (citing *Certain Carbon and Alloy Steel Cut-to-Length Plate from Austria, Belgium, France, the Federal Republic of Germany, Italy, Japan, the Republic of Korea and Taiwan*, 82 Fed. Reg. 24,096 (Dep't of Commerce May 25, 2017) (*CTL Plate Order*)).  However, an order in which military grade merchandise was explicitly excluded through detailed specifications does not compel an agency-wide exclusion for military grade steel.  *See CTL Plate Order* (excluding "military grade armor plate certified to {17} specifications").  In fact, all that the *CTL Plate Order* proves is that Commerce could have excluded certain end-uses or customer types from the order but elected not to do so.  And there is no "such thing as a 'canon of donut holes'" that would create a "tacit exception."  *Bostock v. Clayton County*, 590 U.S. 644, 669 (2020).  Indeed, when Commerce "chooses not to include any exceptions to a broad rule, courts apply the broad rule."  *Id*.

In sum, a "totally different name" cannot remove a home market sale from paragraph 1677(16)(A)'s sweep.  Transcript (P.R. 97) at 16-19.

16

**IV.    Edelstahl Failed To Exhaust Administrative Remedies With Respect To Home Market Sales Adjustments Rather Than Exclusions**

Edelstahl advances a new argument that it neglected to raise administratively, either in its case brief or at any point before Commerce, contending that Commerce should "have accounted for the difference in product types" and made adjustments to the home market sales.  Pl. Br. at 26.  In contrast, Edelstahl's administrative arguments, from the outset through its final case brief, focused exclusively on the exclusion of fluid end bars and custom blocks from the comparison set.  Section B Response (P.R. 44, C.R. 19) (failing to raise "product type" argument); Edelstahl Case Brief (P.R. 88, C.R. 84).  Edelstahl thus failed to exhaust its administrative remedies, and the Court should reject these arguments.  28 U.S.C. § 2637(d); 19 C.F.R. 351.309; *Boomerang Tube LLC v. United States*, 856 F.3d 908, 912-13 (Fed. Cir. 2017).

"Exhaustion serves two main purposes": to protect administrative agency authority and to promote judicial efficiency.  *Stanley Works (Langfang) Fastening Sys. Co., Ltd. v. United States*, 279 F. Supp. 3d 1172, 1189 (Ct. Int'l Trade 2017) (quoting *Sandvik Steel Co. v. United States*, 164 F.3d 596, 600 (Fed. Cir. 1998)).  There are limited exceptions, none of which are present.  Under the first of these, a pure question of law may excuse a failure to exhaust if the party raises "a new argument that is of a purely legal nature" that does not "require further agency involvement, additional fact finding, or opening up of the record" and does not "create undue delay nor cause expenditure of scarce party time and resources."  *Gerber Food (Yunnan) Co. v. United States*, 601 F. Supp. 2d 1370, 1380 (Ct. Int'l Trade 2009).  Failure to exhaust may also be excused by a lack of access to the confidential record or by an intervening judicial decision, "which if applied might have materially altered the result."  *Id*. (internal citations omitted).  Lastly, parties need not exhaust if doing so would have been futile, but the exception is narrow and "{t}he mere fact that an adverse decision may have been likely does not excuse a party from

17

a statutory or regulatory requirement that it exhaust administrative remedies." *Corus Staal BV v. U.S.*, 502 F.3d 1370, 1379 (Fed. Cir. 2007).

Edelstahl cannot avail itself of any exception. The question whether Commerce should have adjusted for different product types requires a highly fact-intensive inquiry into the physical characteristics of the subject merchandise and the product at issue. Indeed, it is for this reason that Commerce requires that parties raise model match arguments early in administrative proceedings. Section B Response (P.R. 44, C.R. 19). Thus, it is not a pure question of law—further agency involvement would be required. Next, Edelstahl does not cite any intervening legal authorities that would have materially altered the result (nor are we aware of any), and Edelstahl has access to the confidential record. Edelstahl also could have raised this argument before Commerce because it raised other arguments that Commerce fully addressed, and there is no indication Commerce would not have likewise provided reasoned consideration of this issue.

Moreover, as it did here, Commerce's established practice is to request and consider model match comments during the fact-gathering stage of the proceeding. *See Honey from Argentina: Final Results of Antidumping Duty Administrative Review*, 69 Fed. Reg. 30,283 (Dep't of Commerce May 27, 2004), and accompanying Issues and Decision Memorandum at cmt. 15 (explaining that, as "our practice indicates, {Commerce} prefers to address model match criteria early in a segment of a proceeding so that all parties have an opportunity to comment and address any reporting issues which may result from changes. Early consideration of these issues allows them to be considered on their own merits, rather than as a result of their impact on any particular respondent's margin calculation."). Indeed, the Court has previously sustained Commerce's decisions not to address model match comments that were raised in administrative case briefing but were not raised with sufficient time for Commerce and the parties to develop

the factual record with respect to model match.  *See JTEKT Corp. v. United States*, 37 F. Supp.

3d 1326, 1335-36 (Ct. Int'l Trade 2014) (explaining that, "in light of the time constraints under

which it must conduct a review and the obligations to ensure both consistency and procedural

fairness with respect to all parties in a review," Commerce does not abuse its discretion by

rejecting untimely proposals for product characteristics); *see also Ag Der Dillinger Huttenwerke*

*v. United States*, No. 1:17-cv-00158 (Ct. Int'l Trade Aug. 18, 2021), ECF No. 121 at 7-8

(sustaining Commerce's rejection of a proposed quality code because it was not submitted within

the time for submitting model match comments for the investigation).  And indeed, Edelstahl had

numerous opportunities at the outset of the proceeding to object to the model match methodology

but elected not to do so.  *See*, *e.g*., Initial Questionnaire (P.R. 24) at B-9; Section B Response

(P.R. 44, C.R. 19).  In sum, considering Edelstahl's wholly unexhausted arguments at this late

stage would run afoul of cases confirming Commerce's discretion when considering model

match comments and inject undue delay into administrative proceedings.

Finally, Edelstahl disregards the rule that Commerce requires "compelling reasons" to

modify model match hierarchies used in previous segments of the proceeding.  *Manchester Tank*

*& Equip. Co. v. United States*, 483 F. Supp. 3d 1309, 1315 (Ct. Int'l Trade 2020).  "'Compelling

reasons' require the agency to provide 'compelling and convincing evidence that the existing

model-match criteria are not reflective of the merchandise in question, that there have been

changes in the relevant industry, or that there is some other compelling reason' requiring the

change." *Id*. (quoting *Fagersta Stainless AB v. United State*s, 577 F. Supp.2d 1270, 1277 (Ct.

Int'l Trade 2008)).  The burden to develop the factual record also applies to respondents, which

must "provide a compelling reason to change the model-match criteria by presenting their

proposed modifications and supporting evidence to Commerce during the administrative

process." *La Molisana*, 633 F. Supp. 3d at 1272. Here, in addition to failing to articulate any claim before Commerce administratively, Edelstahl has failed to make the demonstration required by this Court's precedent and has waived any further arguments in this regard. *See SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed. Cir. 2006) (explaining that the "law is well established that arguments not raised in the opening brief are waived.").

## CONCLUSION

For these reasons, we respectfully request that this Court deny Edelstahl's motion and enter judgment for the United States.

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney
General

PATRICIA M. McCARTHY
Director

/s/  FRANKLIN E. WHITE, JR.
Assistant Director

OF COUNSEL:

DANIELLE COSSSEY
Attorney
Office of the Chief Counsel
  for Trade Enforcement and Compliance
United States Department of Commerce

/s/  STEPHEN C. TOSINI
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20004
Telephone: (202) 616-5196
Facsimile: (202) 514-7969
E-mail: stephen.tosini@usdoj.gov

May 15, 2025

Attorneys for defendant

20

## CERTIFICATE OF COMPLIANCE

I hereby certify, pursuant to section 2(B)(1) of the Standard Chambers Procedures of this Court, that this brief contains 6,066 words, excluding the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare this brief (Microsoft Word).

*/s/Stephen Carl Tosini*