UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: The Honorable Mark A. Barnett, Chief Judge

———————————————————————

|  |  |  |
|---|---|---|
| BGH EDELSTAHL SIEGEN GMBH, | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| UNITED STATES, | ) | Ct. No. 24-00176 |
| Defendant, | ) | |
| and | ) | **PUBLIC VERSION** |
| ELLWOOD CITY FORGE COMPANY, *et. al.*, | ) | Confidential information deleted in Appendix 1 |
| Defendant-Intervenors. | ) | |

———————————————————————

## REPLY BRIEF OF
## <u>BGH EDELSTAHL SIEGEN GMBH</u>

Marc E. Montalbine
J. Kevin Horgan
Merisa A. Horgan
**DEKIEFFER & HORGAN, PLLC**
1015 Fifteenth Street, N.W.
6th Floor
Washington, D.C. 20005
Tel: (202) 783-6900
email:  montalbine@dhlaw.de
*Counsel to BGH Edelstahl Siegen GmbH*

Dated: July 21, 2025

**TABLE OF CONTENTS**

I.  ARGUMENT ................................................................................................ 1

    A.  Commerce Improperly Applied the Description of Products Under
        Review by Giving No Effect to the Term "Fluid End Blocks" ............................ 2

    B.  BGH Is Not Arguing for an Actual End-Use Restriction ...................................... 6

    C.  Military Equipment Blocks and Compounding Machine Blocks Do Not
        Meet the Definition of "Foreign Like Product" .................................................. 10

    D.  Forged Bars Produced By BGH Lippendorf Do Not Meet the
        Definition of "Foreign Like Product" ................................................................ 12

    E.  Commerce's Expansion of the Product Scope to Cover Forged Steel Articles
        Not Meeting the Definition of Fluid End Blocks Extends the
        Scope Beyond the Limits of the ITC Injury Determination and Is Unlawful...... 14

    F.  BGH Has Properly Raised the Alternative Arguments Presented
        in Section IV. C. of its Initial Brief...................................................................... 16

II.  CONCLUSION AND PRAYER FOR RELIEF ........................................................ 17

# TABLE OF AUTHORITIES

## Cases

ArcelorMittal Stainless Belgium N.V. v. United States,
  694 F.3d 82 (Fed. Cir. 2012)................................................................................. 5

Atkore Steel Components, Inc. v. United States,
  313 F. Supp. 3d 1374 (CIT 2018) ........................................................................ 7

Eckstrom Indus., Inc. v. United States,
  254 F.3d 1068 (Fed. Cir. 2001)............................................................................ 6

King Supply Co., LLC v. United States,
  674 F.3d 1343 (Fed. Cir. 2012)....................................................................... 9, 10

Medline Indus., Inc. v. United States,
  62 F.3d 1407 (Fed. Cir. 1995)............................................................................. 4

Meridian Prods., LLC v. United States,
  851 F.3d 1375 (Fed. Cir. 2017)............................................................................ 6

OMG, Inc. v. United States,
  972 F.3d 1358 (Fed. Cir. 2020)..................................................................... 4, 6, 7

OMG, Inc. v. United States,
  321 F. Supp. 3d 1262 (CIT 2018) ........................................................................ 7

Pesquera Mares Australes Ltda. v. United States,
  266 F.3d at 1382 (Fed. Cir. 2001)................................................................. 11, 12

Union Steel v. United States,
  753 F. Supp. 2d 1317 (CIT 2011) ...................................................................... 11

Wheatland Tube Co. v. United States,
  973 F. Supp. 149, 158 (CIT 1997) ................................................................. 2, 15

## Statutes

19 U.S.C. § 1673 ................................................................................................. 2, 15

19 U.S.C. § 1677(16)(A) ...................................................................................... *passim*

19 U.S.C. § 1677(16)(B) or (C) ................................................................................... 3

19 U.S.C. § 1677(25) .................................................................................................. 3

**Regulations**

19 C.F.R. § 351.225(k)(1)(i) ........................................................................................... 14

Pursuant to this Court's amended scheduling order of June 27, 2025 (ECF No. 37) and Rule 56.2(d) of the Rules of this Court, Plaintiff, BGH Edelstahl Siegen GmbH ("BGH" or "BGH Siegen"), hereby submits this brief in reply to Defendant's response to Plaintiff's motion for judgment on the agency record (May 15, 2025) (ECF No. 32) ("Gvt. Br.") and the response brief of Defendant-Intervenors, Ellwood City Forge Co., Ellwood Quality Steels Co., Ellwood National Steel Co. and A. Finkl & Sons (collectively, "Petitioners" or "Defendant-Intervenors") (June 6, 2025) (ECF No. 33) ("Def.-Int. Br.").

## I.     ARGUMENT

Both the Government and the Defendant-Intervenors argue that the term "fluid end blocks" is irrelevant in determining whether a product meets the Description of Products Under Review in this proceeding.  In fact, the Government goes so far as to argue that the scope of the order is "expansive" and includes "forged steel *articles*" not "constricted" by the "definition of fluid end blocks" cited by BGH in its initial brief.  *See* Gvt. Br. 1-2 (emphasis added).  The problem is that such an expansive interpretation of the scope of this proceeding to include forged steel articles regardless of whether they meet the definition of fluid end blocks ("FEBs") in finished or unfinished condition conflicts with the clear, unambiguous language of the product description and contradicts the sworn testimony and filings presented by Petitioners to the U.S. International Trade Commission ("ITC") during the injury investigation phase of this proceeding.

Indeed, neither the Government nor the Defendant-Intervenors provide any response whatsoever to BGH's arguments concerning the U.S. industry's sworn statements to the ITC that "all unfinished FEBs are dedicated to the production of finished FEBs and that there is no separate market for unfinished FEBs" and that these statements formed the basis of the ITC's

injury determination in this proceeding as well as Commerce's scope determination in the
original investigation.  *See* Pl. Br. 14-17 & 24-26.[1]  The Government and the Defendant-
Intervenors also fail to provide any response to BGH's discussion of *Wheatland Tube* in which
this Court explained that Commerce may not expand the scope of a proceeding "beyond the
limits of the ITC injury determination."  Wheatland Tube Co. v. United States, 973 F. Supp. 149,
158 (CIT 1997) (citing 19 U.S.C. § 1673 (1994)).  *See* Pl. Br. 16-17 & 25-26.

A.    **Commerce Improperly Applied the Description of Products Under Review
by Giving No Effect to the Term "Fluid End Blocks"**

Both the Government and the Defendant-Intervenors concede that Commerce gave no
effect to the term "fluid end blocks" in determining which products sold in the German home
market to treat as "foreign like product" in its dumping margin calculations.  The Government
argues that the scope of the order should be interpreted in an "expansive" manner to include any
"forged steel *articles*" meeting the physical and chemical requirements set out in the product
description regardless of whether the products meet the common definition of fluid end blocks or
the definition of finished and unfinished fluid end blocks set out in the product description.  *See*
Gvt. Br. 1-2 & 10-16 (emphasis added).

In its final results, Commerce stated simply that any products meeting the physical and
chemical requirements set out in the product (scope) description "are foreign like products within
the meaning of section 771(16)(A) of the Act."  IDM, 8; P.R. 99 (referring to 19 U.S.C.
§ 1677(16)(A)).  Commerce did not otherwise discuss the language of the scope description or
the precise application of section 1677(16)(A) to the facts of this case.  Commerce specifically

---

[1] Citations to BGH's March 17, 2025 Rule 56.2 memorandum in support of motion for judgment
upon the agency record (ECF No. 30 & 31) are indicated as "Pl. Br."

2

stated that it did not reach the question of whether the products at issue would fall under sections 1677(16)(B) or (C).  IDM, 8, n.29; P.R. 99.

As shown by the text of 19 U.S.C. § 1677(16)(A), the definition of "foreign like product" begins with an identification of the "subject merchandise."  19 U.S.C. § 1677(16)(A).  In turn, "subject merchandise" is identified by the scope of the review.  19 U.S.C. § 1677(25).  The scope of this review was enunciated in the Description of Products Under Review in Appendix III to the questionnaire.  Questionnaire, App. III; P.R. 24.

In its initial brief, BGH provided a detailed analysis of each portion of the product description.  Pl. Br. 8-14.  The product description begins by stating:

> The products under review are forged steel fluid end blocks (fluid end blocks), whether in finished or unfinished form, and which are typically used in the manufacture or service of hydraulic pumps.

Questionnaire, App. III; P.R. 24.  The primary element of this description is that the products under review are expressly limited to "fluid end blocks."  Accordingly, any product that does not meet the definition of "fluid end blocks" cannot be considered as merchandise under review.

Fluid end blocks are clearly defined in the U.S. Harmonized Tariff Schedule as parts of hydraulic fluid power pumps under HTSUS No. 8413.91.9055.  See Pl. Br. 9-10.  This common definition of fluid end blocks is reinforced by the Description of Products Under Review.  Near the end of the product description, the term fluid end blocks in "finished condition" is defined as "ready for incorporation into a pump fluid end assembly without further finishing operations" and the term fluid end blocks in "unfinished condition" is defined as "forged but still requiring one or more finishing operations before it is ready for incorporation into a pump fluid end assembly."  See Pl. Br. 14 (quoting Questionnaire, App. III; P.R. 24).  Thus, whether in finished

condition or unfinished condition a fluid end block is a product designed "for incorporation into a pump fluid end assembly."[2]

While the product description goes on to define the terms "forged" and "steel," the term "fluid end blocks" is not otherwise defined. Therefore, the product description must be understood as applying the plain, common meaning of "fluid end blocks." *See* OMG, Inc. v. United States, 972 F.3d 1358 (Fed. Cir. 2020) (finding that Commerce's treatment of certain fasteners as "nails" was in conflict with the term's unambiguous, common meaning); *see also*, Medline Indus., Inc. v. United States, 62 F.3d 1407, 1409 (Fed. Cir. 1995) (explaining that tariff terms are construed in accordance with their common and popular meaning).

As explained in BGH's initial brief, none of the physical characteristics listed in the product description are meant to expand the scope of merchandise beyond the group of products commonly known as fluid end blocks ("FEBs"). *See* Pl. Br. 11-14. For example, the product dimensions do not state that any forged steel article meeting the broad dimensional ranges is a subject FEB. To the contrary, the dimensional ranges are expressly limited to products that are already defined as "fluid end blocks" either "cut-to-length" or in "strings." Questionnaire, App. III; P.R. 24. Thus, a product first has to meet the definition of a fluid end block and then meet the dimensional ranges to satisfy the description of products under review. These dimensional ranges are also too broad and variable to cover only forged steel items that are fluid end blocks. For example, the dimensions would cover a forged steel item roughly as small as a shoe box (*i.e.*, 8" x 8" x 11") to larger than a standard refrigerator (*i.e.*, 40" x 40" x 75"). Id. The dimensional

---

[2] Neither the Government nor the Defendant-Intervenors provide any response to the arguments made regarding this issue on page 14 of BGH's initial brief.

ranges also permit many disproportional configurations, such as 8" high x 8" wide x 75" long (*i.e.*, over 6 feet long), not suitable for the production of fluid end blocks. Id.

Similarly, the chemical elements listed under the definition of "steel" do not state that any forged steel article meeting the broad chemical ranges is a subject FEB. Id. Rather, the broad chemical ranges encompass a wide variety of standard steel grades such as AISI/SAE "grades 4130, 4135, 4140, 4320, 4330, 4340, 8630, 15-5, 17-4, F6NM, F22, F60, and XM25" used in a number of different products. Id. Under a full reading of the product scope, a forged steel item produced from one of these steel grades would still have to meet the definition of a fluid end block in finished or unfinished form in order to qualify as subject merchandise or foreign like product.

While the Government would like to replace the term "forged steel fluid end blocks" in the product description with the term "forged steel *articles*," this would conflict with the clear and explicit scope language. *See* Gvt. Br. 1-2 (emphasis added). As explained above and in BGH's initial brief, the term "fluid end blocks" is a clearly defined term in the U.S. Harmonized Tariff Schedule and the product description clearly defines both finished and unfinished fluid end blocks in relation to their "incorporation into a pump fluid end assembly." Questionnaire, App. III; P.R. 24. There is simply no ambiguity in the common definition of "fluid end blocks" or how that term is used in the product description.

Given this lack of ambiguity in the term "fluid end blocks," Commerce was obliged to give this language its plain meaning. *See* ArcelorMittal Stainless Belgium N.V. v. United States, 694 F.3d 82, 87 (Fed. Cir. 2012) (stating that when scope language "is not ambiguous, the plain meaning of the language governs"). In this regard, the Government's response brief fully misconstrues BGH's argument. In its response brief, the Government states that BGH "contends

that 'fluid end blocks' is *ambiguous*" and this is the reason why Commerce should rely on the

"'plain, common meaning' of 'fluid end blocks,' which requires the fluid end blocks to be used

as part of a hydraulic fluid power pump."  Gvt. Br. 13-14 (emphasis added).  This is incorrect.

BGH has never argued that the term "fluid end blocks" is ambiguous.  Indeed, there are at least

five different places in its initial brief, where BGH states that the term "fluid end blocks" is not

ambiguous.  *See* Pl. Br. 5, 9-11, 17-18 & 26.

It is precisely because the common meaning of "fluid end blocks" is not ambiguous and

the product description uses this term without providing any modification to this common, plain

meaning that Commerce is obliged to give this language its plain meaning.  Accordingly,

Commerce cannot simply ignore the term "fluid end blocks" when determining if BGH's home

market sales meet the definition of subject merchandise or treat the term as if it said "forged steel

*articles*."  *See* Gvt. Br. 1-2 (emphasis added).  *See* Eckstrom Indus. v. United States, 254 F.3d

1068, 1073 (Fed. Cir. 2001) (stating that Commerce errs when its treats limiting language in the

scope of an antidumping order as mere surplusage); *see also* Meridian Prods., LLC v. United

States, 851 F.3d 1375, 1383 (Fed. Cir. 2017) (holding that scope interpretation must consider all

the terms).

### B.    BGH Is Not Arguing for an Actual End-Use Restriction

The Government's contention that BGH is attempting to "engraft an end-use requirement

onto the scope" of this proceeding is incorrect.  *See* Gvt. Br. 8.  Rather, BGH is simply arguing

that the unambiguous meaning of "fluid end blocks" as used in the product description must be

given effect.  As detailed in BGH's initial brief, the function and design of a product is always

relevant in determining what the product is.  *See* Pl. Br. 23-24.  This is clearly seen by this

Court's analysis in *OMG* where the Court considered whether anchor fasteners met the product

description of the antidumping and countervailing duty orders on *Certain Steel Nails from Vietnam*. In that case, the Court found that Commerce's determination that anchor fasteners were within the scope of the orders conflicted with the plain, common meaning of the term "nail" and was therefore unlawful. OMG, Inc. v. United States, 321 F. Supp. 3d 1262, 1268-69 (CIT 2018), *aff'd* 972 F.3d 1358 (Fed. Cir. 2020). *See* Pl. Br. 23.

Similarly, in *Atkore*, this Court held that Commerce's interpretation of the term "pipe" in the phrase "certain malleable iron pipe fittings" to include electrical conduit fittings was unlawful. Atkore Steel Components, Inc. v. United States, 313 F. Supp. 3d 1374, 1385-86 (CIT 2018). Although conduit fittings are a type of pipe fitting and otherwise satisfied the physical characteristics described in the scope language, the petition documents showed that the term "pipe" as used in the petition was "designed to . . . withstand pressure and temperature changes typical of oil, gas, or sprinkler applications." Id. at 1385. Accordingly, the Court interpreted "pipe" as a limiting term that implied certain requirements, such as pressure tolerance, even though those requirements were not explicitly stated in the scope language. *See* Pl. Br. 23-24.

The same type of analysis is relevant to this proceeding. The plain, common meaning of fluid end blocks is a component of hydraulic pumps. As in the case of defining nails or pipe, this is a question of design and function. Forged steel products that are not designed to function as components for hydraulic pumps do not meet the definition of fluid end blocks.

In their response briefs, neither the Government nor the Defendant-Intervenors make any mention of *Atkore*. The Government attempts to distinguish this Court's decision in *OMG* by claiming that BGH "contends that fluid end blocks must be designed for pump manufacturers based on nothing more than a name." Gvt. Br. 15. This assertion is incorrect.

BGH's statement that fluid end blocks are designed to function as components for hydraulic pumps is based upon a plethora of evidence.

- The U.S. Harmonized Tariff Schedule expressly defines fluid end blocks as parts of hydraulic fluid power pumps under HTSUS No. 8413.91.9055.  *See* Pl. Br. 9-10.

- The product description uses the term "fluid end blocks" without providing any modification to this plain, unambiguous definition.  *See* Pl. Br. 9-11.

- The product description clearly defines both finished and unfinished fluid end blocks in relation to their "incorporation into a pump fluid end assembly."  *See* Pl. Br. 14.

- The petition documents stress that "unfinished" fluid end blocks are "dedicated for eventual use in the fluid end assembly of a hydraulic pump" and that "there are no separate markets or functions for unfinished FEBs as distinct from finished FEBs - i.e., they are all sold to pump manufacturers."  *See* Pl. Br. 14-15.

- Representatives of the U.S. industry gave sworn testimony to the ITC that unfinished FEBs have no use other than the production of finished FEBs.  *See* Pl. Br. 15-16.

- Based upon these sworn submissions and testimony, the ITC found that "unfinished FEBs are an intermediate product dedicated exclusively to the production of finished FEBs, with no other uses" and that "{t}here is no separate market for unfinished FEBs." The ITC therefore based its injury determination on a single domestic like product for finished and unfinished FEBs.  *See* Pl. Br. 16-17.

- Commerce's preliminary and final scope decisions in the original investigation are also based upon the sworn submissions and testimony presented to the ITC.  Commerce's scope decisions are expressly based upon the evidence that during "the International Trade Commission hearing, the petitioners stated that no opportunity exists to use forged

blocks, which meet the 'chemistries and configurations' of fluid end blocks, for another

purpose." *See* Pl. Br. 24-25.

The Government and Defendant-Intervenors simply ignore all of this evidence.

Moreover, the Government's and Defendant-Intervenors' reliance upon *King Supply* is

inapposite. *King Supply* involved a product, "carbon steel butt-weld pipe fittings," that could be

designed for suitability in a number of different applications, including piping systems to convey

gases or liquids and structural applications, such as fences, guardrails, play-ground equipment,

and scaffolding. King Supply Co., LLC v. United States, 674 F.3d 1343, 1346 (Fed. Cir. 2012).

In fact, the underlying ITC injury determination specifically listed all of these potential

applications and was based upon a domestic like product that included "*all* pipe fittings . . .

*regardless of use*." Id. at 1346. Based upon this broad wording, Commerce determined that

butt-weld pipe fittings imported into the United States "for structural use in applications such as

handrails, fencing, and guardrails" were subject to the applicable antidumping duty order. Id. at

1347.

The situation in this present case is vastly different from the situation in *King Supply*.

The product scope in this case is based upon a product having a precise definition with respect to

design and application for hydraulic pumps, and the product description clearly defines both

finished and unfinished fluid end blocks in relation to their suitability for "incorporation into a

pump fluid end assembly." The underlying ITC injury determination was also specifically

limited to a single domestic like product for finished and unfinished FEBs "dedicated exclusively

to the production of finished FEB" based upon sworn evidence presented by the U.S. industry, itself.[3]

BGH is not arguing that a forged steel article manufactured for suitability as a finished or unfinished fluid end block must actually be used in the manufacture of hydraulic pumps in order to be considered subject merchandise.  In fact, BGH has reported its home market sales of forged steel blocks irregardless of how the customer will use the forged blocks.  Rather, as further explained below, it is only those specific articles, such as specially customized Military Equipment and Compounding Machine Blocks and forged steel bars, which do not meet the definition of "foreign like product," that BGH is requesting be excluded from Commerce's antidumping margin calculations.

C.    **Military Equipment Blocks and Compounding Machine Blocks Do Not Meet the Definition of "Foreign Like Product"**

In its initial brief, BGH has detailed the physical characteristics demonstrating that Military Equipment Blocks and Compounding Machine Blocks do not meet the definition of forged steel fluid end blocks in either finished or unfinished form.  *See* Pl. Br. 20-23.  This factual information shows that these specially customized blocks are produced according to detailed customer drawings and specifications for expressly identified products such as military equipment and plastic extruding machines.  It is beyond dispute that none of these specially customized Military Equipment Blocks and Compounding Machine Blocks meet the product description for <u>finished</u> fluid end blocks as "ready for incorporation into a pump fluid end assembly without further finishing operations."  *See* Questionnaire, App. III; P.R. 24.

---

[3] *King Supply* also involved a scope ruling pertaining to whether merchandise imported into the United States would be subject to the antidumping duty order.  By contrast, this present case is limited to the narrow issue of whether certain enumerated home market sales transactions should be matched with U.S. sales in Commerce's margin calculations.

These specially customized Military Equipment Blocks and Compounding Machine Blocks also fail to meet the product description for <u>unfinished</u> fluid end blocks as "requiring one or more finishing operations before it is ready for incorporation into a pump fluid end assembly." <u>Id</u>.  These specially customized blocks have already undergone finishing operations such as milling, contour machining, heat treating and drilling according to detailed customer drawings and specifications to specially design them for use in military equipment and plastic extruding machines.  All of these facts demonstrating differences in the physical characteristics between customized Military Equipment and Compounding Machine Blocks and fluid end blocks are supported by certified evidence on the administrative record (including customer information, certified statements, customer drawings, specifications, mill certificates and other sales and production documents), and none of this information has been contested or refuted.  *See* Pl. Br. 20-23.

Accordingly, because these specially customized Military Equipment Blocks and Compounding Machine Blocks do not meet the definition of forged steel fluid end blocks in either finished or unfinished form, they cannot be considered as "subject merchandise" as incorporated in the definition of "foreign like product" under section 1677(16)(A).  Similarly, these specially customized Military Equipment Blocks and Compounding Machine Blocks produced by BGH Siegen are also not identical in physical characteristics with the subject merchandise exported by BGH Siegen to the United States.  Merchandise can only be treated as "identical" under 19 U.S.C. § 1677(16)(A) if any differences in physical characteristics are only minor and "not commercially significant."  <u>Union Steel v. United States</u>, 753 F. Supp. 2d 1317, 1322 (CIT 2011) (citing <u>Pesquera Mares Australes Ltda. v. United States</u>, 266 F.3d 1372, 1382-81 (Fed. Cir. 2001)).

There is no evidence that the differences in physical characteristics between customized Military Equipment and Compounding Machine Blocks and fluid end blocks are only minor and commercially insignificant.  To the contrary, the customized processing to specially design these blocks for specific use in military equipment and plastic extruding machines is by definition commercially significant because it renders these forgings a separately identifiable product distinct from fluid end blocks.  *See* Pesquera, 266 F.3d at 1374 & 1384-85 (supporting examination of "commercial practice" in distinguishing between different products as evidence of commercially significant differences in physical characteristics).

Similarly, as shown by the data from BGH's home market sales file presented in Appendix 1 of its initial brief, both the weighted-average net price and cost of production of these customized Military Equipment and Compounding Machine Blocks are well outside the range of other forged blocks sold in the home market during the period of review.  *See* Pl. Br. App. 1.  Moreover, as shown by the data from BGH's home market and U.S. sales files presented in Appendix 1 of this reply brief, under Commerce's model-match hierarchy, none of the CONNUMs assigned to the customized Military Equipment and Compounding Machine Blocks are identical matches to the CONNUMs of the subject merchandise sold in the U.S. market.

**D.    Forged Bars Produced By BGH Lippendorf Do Not Meet the Definition of "Foreign Like Product"**

In its initial brief, BGH has detailed the physical characteristics demonstrating that forged steel bars produced by BGH Lippendorf do not meet the definition of forged steel fluid end blocks in either finished or unfinished form.[4]  *See* Pl. Br. 11-12 & 19-20.  As explained, forged

---

[4] In discussing this issue in its response brief, the Government uses a wide range of purported product names that simply do not exist and are nowhere referenced in the administrative record (*e.g.*, "fluid end bars", "forged end 'bars'" and "forged end blocks").  Gvt. Br. 4, 8, 11-13 & 17.

steel bars are substantially different from forged steel blocks. Forged blocks are large solid steel blocks of rectangular or square cross section, having a very large cross-sectional dimension, while forged bars have a very small cross-sectional dimension and are normally forged in lengths of well over two meters. Id. at 19. Because of the small cross-sectional dimension, forged bars are not suitable for incorporation into the fluid end assembly of a hydraulic pump. Id.

Forged bars are also produced on smaller, less powerful forging equipment. For example, BGH Lippendorf's forging equipment is much smaller in size and force than the forging equipment used by BGH Siegen. Id. As a result, BGH Lippendorf's forging equipment cannot forge the large ingots required to achieve the large reduction ratios[5] and intensive core compression necessary to produce fluid end blocks. Id. at 19-20. Indeed, none of subject merchandise fluid end blocks sold to the United States were produced by BGH Lippendorf. Rather all of the subject merchandise sold to the United States was produced exclusively by BGH Siegen.

All of these facts are supported by certified factual information on the administrative record and none of this information has been contested or refuted. This factual information demonstrates that forged steel bars do not meet the definition of forged steel fluid end blocks in either finished or unfinished form in the product scope. As such these forged steel bars do not meet the definition of "foreign like product" under 19. U.S. C. § 1677(16)(A) as "subject merchandise." The forged steel bars would also not qualify as identical merchandise produced "by the same person" since they are produced by BGH Lippendorf and not BGH Siegen. 19

---

[5] The reduction ratio or reduction rate is the amount by which the ingot used as the raw material for the forged steel block must be reduced in producing the finished block. See Pl. Br. 21. In the hearing transcript, the term "reduction ratio" is incorrectly listed as "production ratio." See Gvt. Br. 7.

U.S.C. § 1677(16)(A).  Moreover, as with the customized Military Equipment and Compounding Machine Blocks discussed above, forged steel bars represent a separately identifiable product commercially distinct from fluid end blocks, and none of the CONNUMs assigned to the forged steel bars in the excluded (non-subject) transactions file (bghhm_ns02.sas7bdat) are identical matches to the CONNUMs of the subject merchandise sold in the U.S. market (bghus02.sas7bdat).

### E.    Commerce's Expansion of the Product Scope to Cover Forged Steel Articles Not Meeting the Definition of Fluid End Blocks Extends the Scope Beyond the Limits of the ITC Injury Determination and Is Unlawful

As detailed in BGH's initial brief, the U.S. industry certified to the ITC through its petition documents and sworn testimony that unfinished FEBs have no use other than the production of finished FEBs and there are no separate markets or functions for unfinished FEBs as distinct from finished FEBs, with both finished and unfinished FEBs being sold to pump manufacturers for incorporation into pump fluid end assemblies.  Pl. Br. 14-15.  This sworn evidence was crucial in the ITC's injury determination, which based its injury determination on a single domestic like product for finished and unfinished FEBs "dedicated exclusively to the production of finished FEBs."[6]  Pl. Br. 16-17.  Accordingly, the ITC made no injury determination concerning general forged steel articles not within the same domestic like product as finished FEBs.

It is therefore not permissible for Commerce to extend the product scope beyond the limits of the ITC injury determination and expansively interpretate the scope of this proceeding

---

[6] The description of the merchandise contained in the petition and the ITC injury determinations are primary sources under 19 C.F.R. § 351.225(k)(1)(i) for interpretating the scope language.

to include "forged steel *articles*" regardless of whether they meet the definition of fluid end

blocks. *See* Gvt. Br. 1-2 (emphasis added). As this Court explained in *Wheatland Tube*:

> A fundamental requirement of both U.S. and international law is that an
> antidumping duty order must be supported by an ITC determination of material
> injury covering the merchandise in question. . . . It would follow that any
> expansion of the scope by Commerce would extend the antidumping duty order
> beyond the limits of the ITC injury determination and would therefore violate
> both U.S. and international law.

Wheatland Tube Co. v. United States, 973 F. Supp. 149, 158 (CIT 1997) (citing 19 U.S.C.

§ 1673 (1994)).

In their response briefs, neither the Government nor the Defendant-Intervenors provide

any comments on the U.S. industry's sworn statements to the ITC, which precisely limited the

scope of this proceeding, or on the application of *Wheatland Tube*. What is clear is that, having

through their testimony precisely limited the scope of the injury determination to finished and

unfinished FEBs "dedicated exclusively to the production of finished FEBs," the Defendant-

Intervenors cannot now properly argue that the scope should be expanded to forged steel articles

having no connection to fluid end blocks.

The Government and Defendant-Intervenors also fail to acknowledge that Commerce's

preliminary and final scope decisions in the original investigation were expressly based upon the

U.S. industry's testimony before the ITC. In both its preliminary and final scope decision

memoranda, Commerce stated:

> During the International Trade Commission hearing, the petitioners stated that no
> opportunity exists to use forged blocks, which meet the "chemistries and
> configurations" of fluid end blocks, for another purpose and that purchasers
> sometimes prefer to purchase an unfinished fluid end block and complete varying
> levels of finishing operations themselves. ***We interpret this statement to mean***
> that forged steel blocks meeting the specifications of fluid end blocks, as defined
> in the scope of the investigations, should be treated as fluid end blocks.

<u>Scope Comments Decision Memorandum for the Preliminary Determinations</u>, 6 (May 18, 2020) (emphasis added); <u>Scope Comments Decision Memorandum for the Final Determinations</u>, 5-6 (Dec. 7, 2020) (emphasis added).

Accordingly, Defendant-Intervenors' sworn documents and testimony before the ITC serve to limit expansion of the product scope in this proceeding.

**F.     BGH Has Properly Rasised the Alternative Arguments Presented in Section IV. C. of its Initial Brief**

Contrary to the claims of the Government and Defendant-Intervenors, BGH has not failed to exhaust its alternative claim that, if Commerce included home market sales of additional products that were not fluid end blocks in its dumping calculations, it should have accounted for the difference in product types in its margin calculations. *See* Gvt. Br. 16-20; Def.-Int. Br. 14-16.

In its case brief submitted during the underlying administrative review, BGH expressly argued that BGH Siegen's U.S. sales of forged steel fluid end blocks should not be compared in Commerce's margin calculations with any home market sales of bar products or customized blocks produced according to customer drawings for military equipment or machines to produce plastics ("Compounding Machines"). *See* <u>BGH Case Brief</u>, 17 & 19-20; P.R. 88, C.R. 84. Similarly, in its complaint filed with this Court, BGH expressly stated that the "production, design and application of a product should also be considered in making a 'fair comparison' between the export price or constructed export price and normal value under 19 U.S.C. § 1677b(a)." <u>Complaint</u>, ¶ 32 (Oct. 16, 2024) (ECF No. 7).

**II.     Conclusion and Prayer for Relief**

For the reasons stated above and in BGH's initial brief, we respectfully request that the
Court find that Commerce's final results are not supported by substantial evidence on the
administrative record and not in accordance with the law and remand this case to Commerce for
redetermination.

Respectfully submitted,

/s/ Marc E. Montalbine
Marc E. Montalbine*
J. Kevin Horgan
Merisa A. Horgan
**DE KIEFFER & HORGAN, PLLC**
1015 Fifteenth Street, N.W.
6th Floor
Washington, DC 20005
Tel: (202) 783-6900
Fax: (202) 783-6909
email:  montalbine@dhlaw.de
Date: July 21, 2025                    *Counsel to BGH Edelstahl Siegen GmbH*

_____

* Admitted to Virginia Bar; practice limited to Federal International Trade Matters pursuant to
D.C. Bar Rule 49(c)(2).

17

**PUBLIC VERSION**

Appendix 1

**Comparison of CONNUMs Sold in the U.S. & Home Markets**

| U.S. Sales CONNUMU | Home Market Sales to Customer [     ] (Military Equipment Blocks) CONNUMH | Home Market Sales to Customer [     ] (Compounding Machine Blocks) CONNUMH |
|---|---|---|
| [ | | ] |
| [ | | ] |
| [ | | ] |
| [ | | ] |
| [ | | ] |
| [ | | ] |
| [ | | ] |
| [ | | ] |
| [ | | ] |
| [ | | ] |
| [ | | ] |
| [ | | ] |
| [ | | ] |
| [ | | ] |
| [ | | ] |

Source: U.S. Sales File bghus02.sas7bdat; Home Market Sales File bghhm02.sas7bdat

**Word Count Certificate of Compliance**

This brief has been prepared utilizing Word for Microsoft 365 using a proportionally spaced typeface (12 point Times New Roman font).

In accordance with the Chambers Procedures of this Court, the undersigned certifies that this brief complies with the word limitations set forth in the amended scheduling order dated June 27, 2025 (ECF No. 37).  Specifically, excluding those exempted portions of the brief, as set forth in section 2(B)(1) of the Chambers Procedures, I hereby certify that this brief contains **4,978** words.  In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

<div style="margin-left: 40%;">

/s/ Marc E. Montalbine

Marc E. Montalbine*

**DEKIEFFER & HORGAN, PLLC**

1015 Fifteenth Street, N.W.

6th Floor

Washington, DC 20005

Tel: (202) 783-6900

Fax: (202) 783-6909

email:  montalbine@dhlaw.de

*Counsel to BGH Edelstahl Siegen GmbH*

</div>

Date: July 21, 2025

_____

* Admitted to Virginia Bar; practice limited to Federal International Trade Matters pursuant to D.C. Bar Rule 49(c)(2).