Slip Op. 25-140

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| BGH EDELSTAHL SIEGEN GMBH, <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> ELLWOOD CITY FORGE COMPANY, ET AL., <br><br> Defendant-Intervenors. | Before: Mark A. Barnett, Chief Judge <br> Court No. 24-00176 |

## OPINION

[Sustaining the U.S. Department of Commerce's final results in the 2022 administrative review of the antidumping duty order on forged steel fluid end blocks from Germany.]

Dated: October 22, 2025

Marc E. Montalbine, J. Kevin Horgan, and Merisa A. Horgan, deKieffer & Horgan, PLLC, of Washington, DC, for Plaintiff BGH Edelstahl Siegen GmbH.

Kristin E. Olson, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for Defendant United States. On the brief were Yaakov M. Roth, Acting Assistant Attorney General, Patricia M. McCarthy, Director, Franklin E. White, Jr., Assistant Director, and Stephen C. Tosini, Senior Trial Counsel. Of counsel on the brief was Danielle V. Cossey, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

Jack A. Levy, Daniel J. Calhoun, Paul K. Keith, and Noah A. Meyer, Rock Creek Trade LLP, of Washington, DC, for Defendant-Intervenors Ellwood City Forge Co., Ellwood Quality Steels Co., Ellwood National Steel Co., and A. Finkl & Sons.

Barnett, Chief Judge: This case arises out of the U.S. Department of Commerce's ("Commerce" or "the agency") final results in the 2022 administrative review of the antidumping duty ("AD") order on forged steel fluid end blocks ("FEBs") from Germany. *See Forged Steel Fluid End Blocks From Germany*, 89 Fed. Reg. 67,072 (Dep't Commerce Aug. 19, 2024) (final results of the antidumping duty admin. rev.; 2022) ("*Final Results*"), ECF No. 18-1, and accompanying Issues and Decision Mem., A-428-847 (Aug. 9, 2024) ("I&D Mem."), ECF No. 18-2.[1] Plaintiff BGH Edelstahl Siegen GmbH ("Plaintiff" or "BGH") challenges Commerce's treatment of certain forged steel products as merchandise under review for purposes of their inclusion in home market sales and thus the normal value calculations. Confid. [Pl.'s] Rule 56.2 Mem. in Supp. of Mot. for J. on the Agency R. ("Pl.'s Mem."), ECF No. 30; Confid. Reply Br. of [BGH] ("Pl.'s Reply"), ECF No. 38. Defendant United States ("the Government") and Defendant-Intervenors Ellwood City Forge Co., Ellwood Quality Steels Co., Ellwood National Steel Co., and A. Finkl & Sons (collectively, "Defendant-Intervenors") defend the *Final Results*. Def.'s Resp. to [BGH's] Mot. for J. on the Agency R. ("Def.'s Resp."), ECF No. 32; Resp. of Def.-Ints. in Opp'n to Pl.'s Mot. for J. on the Admin. R. ("Def.-Ints.' Resp."), ECF No. 33.

---

[1] The administrative record filed in connection with the *Final Results* is divided into a Public Administrative Record ("PR"), ECF No. 18-4, and a Confidential Administrative Record ("CR"), ECF No. 18-5. Parties submitted joint appendices containing record documents cited in their briefs. Confid. J.A. ("CJA"), ECF No. 40; Public J.A., ECF No. 41. The court references the confidential version of the relevant record documents, unless otherwise specified.

This court has jurisdiction pursuant to section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2018),[2] and 28 U.S.C. § 1581(c). For the reasons discussed herein, the court sustains Commerce's *Final Results*.

## BACKGROUND

### I. Legal Framework

Commerce imposes an antidumping duty on foreign merchandise that "is being, or is likely to be, sold in the United States at less than its fair value" and results in material injury or threat of material injury to a U.S. domestic industry. 19 U.S.C. § 1673. The antidumping duty imposed is "an amount equal to the amount by which the normal value exceeds the export price (or the constructed export price) for the merchandise." *Id.* Accordingly, to determine normal value, Commerce typically must determine "the price at which the foreign like product is first sold . . . for consumption in the exporting country." *Id.* § 1677b(a)(1)(B)(i). While there are three general categories of "foreign like product," in this case Commerce relied on the first of those categories: "The subject merchandise and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, that merchandise." *Id.* § 1677(16)(A).[3] Subject merchandise means, *inter alia*, merchandise within the scope of the order under review. *Id.* § 1677(25).

---

[2] Citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, and references to the U.S. Code are to the 2018 edition, unless otherwise specified.

[3] Commerce defines the foreign like product pursuant to "the first of" the three general categories. 19 U.S.C. § 1677(16). Accordingly, Commerce did not consider, and no party argues that Commerce should have considered, subparts (B) and (C) of section 1677(16).

## II. The Scope of the Order on FEBs From Germany

Commerce published the antidumping duty order on FEBs from Germany in 2021. *Forged Steel Fluid End Blocks From the Federal Republic of Germany and Italy*, 86 Fed. Reg. 7,528 (Dep't Commerce Jan. 29, 2021) (am. final antidumping duty determination for the Federal Republic of Germany and antidumping duty orders) ("*Order*"). The scope of the *Order* covers "forged steel fluid end blocks (fluid end blocks), whether in finished or unfinished form, and which are typically used in the manufacture or service of hydraulic pumps." *Id.* at 7,530. In addition to listing various chemical and physical properties, the scope explains that covered FEBs "may be imported in finished condition (i.e., ready for incorporation into a pump fluid end assembly without further finishing operations) or unfinished condition (i.e., forged but still requiring one or more finishing operations before it is ready for incorporation into a pump fluid end assembly)." *Id.*[4]

## III. Agency Proceeding

In March 2023, Commerce initiated this administrative review. *Initiation of Antidumping and Countervailing Duty Admin. Revs.*, 88 Fed. Reg. 15,642, 15,649 (Dep't

---

[4] Commerce's affirmative investigation determination is summarized in *Forged Steel Fluid End Blocks from the Federal Republic of Germany*, 85 Fed. Reg. 80,018 (Dep't Commerce Dec. 11, 2020) (final determination of sales at less than fair value). While BGH challenged certain aspects of Commerce's determination, BGH did not challenge Commerce's scope determination. *See Ellwood City Forge Co. v. United States*, 46 CIT __, __, 600 F. Supp. 3d 1281, 1287 (2022) (summarizing the claims raised and remanding the determination). That litigation remains ongoing. *See Ellwood City Forge Co. v. United States*, Slip Op. 23-110, 2023 WL 4703309, at *1 (CIT July 24, 2023) (ordering a second remand).

Commerce Mar. 14, 2023).[5] Commerce selected BGH as one of two mandatory respondents for the review. Resp't Selection (Apr. 18, 2023) at 2–3, CR 5, PR 22, CJA Tab 4. In the initial antidumping questionnaire issued to BGH, Commerce defined the "products" or "merchandise" "under review" as "all products within the scope of the review" and, in reference to the foreign like product, such "products sold in [Plaintiff's] home market," i.e., in Germany. Req. for Info. (Apr. 20, 2023) at A-1 n.1, PR 24, CJA Tab 5. Commerce provided the full scope description in Appendix III, and the scope described the merchandise under review as "forged steel fluid end blocks (fluid end blocks), whether in finished or unfinished form, and which are typically used in the manufacture or service of hydraulic pumps." *Id.*, App. III.

While BGH reported home market sales of forged steel products falling within the ranges for the chemical composition and physical dimensions listed in the scope, BGH separately reported certain sales of what it considered "non-subject" merchandise. *See* Resp. to Sec. B of the Antidumping Duty Questionnaire (June 13, 2023) at 2, 9, Apps. B-4, B-5, CR 19, PR 44, CJA Tab 7. BGH explained that it did not consider certain forged steel products to be FEBs because they were produced according to customer specifications for use in products other than hydraulic pumps, such as military equipment or "plastic extruders [and] compounding machines." Resp. to Secs. A–C

---

[5] Commerce rescinded the administrative review covering the period July 23, 2020, through December 31, 2021. *Rescission of Antidumping and Countervailing Duty Admin. Revs.*, 87 Fed. Reg. 45,296 (Dep't Commerce July 28, 2022). Accordingly, the instant review is the initial administrative review of the *Order*.

Court No. 24-00176                                                                                                                         Page 6

Suppl. Questionnaire (Dec. 12, 2023) at 9, CR 42, 45, PR 71, CJA Tab 9.[6] BGH also reported home market sales of forged steel bars produced by an affiliate, BGH Lippendorf, that likewise fell within the ranges for chemical composition and physical dimensions but which BGH did not consider to be FEBs due to other physical differences. *Id.* at 7.[7]

      BGH filed pre-preliminary comments urging Commerce to exclude home market sales of the contested products from the home market sales used for comparison purposes. Cmts. for Prelim. Results (Dec. 20, 2023) at 1–4, CR 60, PR 73, CJA Tab 10. Commerce disagreed, first explaining that the agency

> identified the foreign like products that are identical or similar to the subject merchandise based on the physical characteristics reported by BGH in the following order of importance: (1) chromium content, (2) nickel content, (3) copper content, (4) molybdenum content, (5) minimum specified tensile strength, (6) size, (7) length, (8) machining, (9) bores, (10) normalized heat treatment, (11) austenitized heat treatment, (12) annealed heat treatment, (13) solution annealed heat treatment, (14) tempered heat treatment, (15) age hardened heat treatment, (16) quenched heat treatment, (17) coating, and (18) parts.

Decision Mem. for the Prelim. Results, A-428-847 (Jan. 31, 2024) ("Prelim. Mem.") at 7, PR 84, CJA Tab 12. Commerce noted that the "product control number," or "CONNUM," utilizes the above-stated physical characteristics to guide the agency's comparison of U.S. to home market sales. *Id.* at 5, 7.[8] Commerce determined to

---

[6] The court refers to such forged steel blocks as "custom blocks."
[7] The court refers to such forged steel bars together with the custom blocks as "the contested products."
[8] In an antidumping proceeding, Commerce uses CONNUMs "to identify the individual models of products for matching purposes." *Ad Hoc Shrimp Trade Action Comm. v.*

include "all products sold by BGH that fall within the scope of the *Order*," including those of BGH Lippendorf, in the foreign like product. *Id.* Commerce rejected BGH's arguments to exclude from comparison the home market sales of the contested products based on differing "geometries," end-use, or customization, explaining that BGH does not claim that such products are outside of the scope of the *Order*. *Id.* at 7–8.

    BGH filed an administrative case brief, again urging Commerce to exclude sales of the contested products from the normal value calculations. Case Br. (Mar. 8, 2024) at 4, 7–17, CR 84, PR 88, CJA Tab 14. BGH also argued that 1) U.S. FEB sales "should not be compared with any bar products," and 2) Commerce should exclude sales to certain home market customers from normal value, *id.* at 17; *see also id.* at 19–20.

    For the *Final Results*, Commerce included home market sales of the contested products in its normal value calculations. I&D Mem. at 5–8. Commerce explained that the contested products "meet the scope description" and noted that BGH does not argue that the contested products "fall outside the physical definition of FEBs." *Id.* at 6. Rather, Commerce explained, BGH challenges inclusion of the contested products based on differences in end use. *Id.* Commerce rejected this basis for limiting the foreign like product, finding that the scope of the *Order* does not require subject FEBs to be used in the manufacture or service of hydraulic pumps. *Id.* at 7 (referencing the

---

*United States,* 802 F.3d 1339, 1347 n.9 (Fed. Cir. 2015) (internal quotation marks and citation omitted).

"typically used" language in the scope).  Commerce stated that any end-use restriction in a scope description requires "clear exclusionary language" that is absent here.  *Id.* at 7 & n.16 (citing *King Supply Co. v. United States*, 674 F.3d 1343, 1349 (Fed. Cir. 2012))*.*  Commerce noted that the agency disfavors end-use restrictions in a scope description because they are difficult to enforce at the time of importation.  *Id*. at 7 & n.15 (citing *King Supply*, 647 F.3d at 1348)*.*  Such would be the case here, Commerce explained, because there is no way to identify the contested products without an "examination of drawings to note the intended purpose of the product."  *Id.* at 7–8.  Accordingly, "while end-use might inform the selection of which physical characteristics to include in the scope description, the physical characteristics themselves are controlling in determining 'the subject merchandise,' not the end-use."  *Id.* at 7.  And because the contested products met the physical characteristics of the scope, Commerce found that sales of that merchandise are "appropriate for use in the dumping margin calculations."  *Id.*  This appeal followed.

## DISCUSSION

The court will uphold an agency determination that is supported by substantial evidence on the record and otherwise in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i).  Commerce's decision to include the contested products in the foreign like product meets those requirements.

I.	**Parties' Contentions**

BGH contends that because the products under review were explicitly limited to FEBs, before considering additional physical characteristics (or end use), Commerce

first should have determined whether the contested products *were* FEBs. Pl.'s Mem. at 8–9. According to BGH, Commerce erred in not affording the term "fluid end blocks" its plain meaning as parts of hydraulic pumps. *Id.* at 9–10, 24. BGH argues that Commerce "ignored the term" and instead relied on the physical characteristics "in determining that a wide range of forged products sold in the home market met the 'scope description.'" *Id.* at 11; *see also id.* at 17–18.

Regarding the forged steel bars produced by BGH Lippendorf, BGH contends that they "are substantially different from forged steel blocks," "are not suitable for incorporation into the fluid end assembly of a hydraulic pump," have a "configuration" or "geometry" that is not suited "to the production of [FEBs]," and "are produced on smaller, less powerful forging equipment." *Id.* at 19. Regarding the custom blocks, BGH argues that those products "were designed and produced for specific end products unrelated to [FEBs] or pumps." *Id.* at 21.

BGH contends that the issue is not one of end use, but of the product's "design and function." *Id.* at 23–24. BGH further contends that the scope of the *Order* "has always been understood [to exclude] forged steel products that are not designed to function as components for hydraulic pumps." *Id.* at 25. BGH further contends that, because Commerce neglected to determine whether the contested products consisted of FEBs before treating them as merchandise under review, the court must therefore remand the *Final Results* for Commerce to make this determination. *Id.* at 26. In the alternative, BGH contends that Commerce should have considered differences in product types when matching home market sales to U.S. sales for comparison purposes

(and avers that such consideration would have avoided treating home market sales of the contested products as comparators to U.S. sales). *Id.* at 26–31.

The Government contends that Commerce's inclusion of "typically used" in the scope means that the agency intended for the scope to include products meeting the identified physical characteristics that are *not* used in hydraulic pumps. Def.'s Resp. at 12–13. The Government further contends that BGH does not dispute that the contested products fit within the physical characteristics of the scope, namely, forged and steel specifications, dimensions, tensile strength, and hardness. *Id.* While the Government argues that BGH seeks to "inject an end use requirement," *id.* at 13, BGH overlooks that, for purposes of antidumping duties, the definition of FEBs *is* the scope, *id.* at 15–16. Regarding BGH's alternative argument for distinguishing the contested products when matching home market sales to U.S. sales, the Government contends that BGH failed to exhaust its administrative remedies. *Id.* at 17–20.

Defendant-Intervenors adopt the Government's arguments. Def.-Ints.' Resp. at 10–11. They further contend that BGH's approach would elevate the name of a product over the scope language that "define[s] the 'class or kind' of merchandise administratively referred to as 'forged steel fluid end blocks' for purposes of the antidumping duty proceeding." *Id.* at 13. With respect to BGH's alternative argument, Defendant-Intervenors contend that besides failing to exhaust the argument administratively, BGH did not plead any such claim in its complaint. *Id.* at 14–16.

BGH counters that Defendant and Defendant-Intervenors "concede that Commerce gave no effect to the term 'fluid end blocks'" when it included the contested

products in the foreign like product.  Pl.'s Reply at 2.  And according to BGH, "[f]orged steel products that are not designed to function as components for hydraulic pumps do not meet the definition of [FEBs]."  *Id.* at 7.  BGH further argues that the contested products are not identical in physical characteristics to the subject merchandise.  *Id.* at 10–11.  BGH also argues that Commerce's treatment of the contested products impermissibly expands the scope of the *Order* beyond the U.S. International Trade Commission's ("ITC") injury determination.  *Id.* at 14–16.  Lastly, BGH contends that it adequately exhausted its alternative claim that Commerce "should have accounted for the difference in product types in its margin calculations" when BGH argued before Commerce that U.S. sales of FEBs should not be compared to home market sales of the contested products.  *Id.* at 16.  BGH also avers it adequately pleaded this claim.  *Id.* (citing Compl. ¶ 32, ECF No. 7).

## II. Analysis

The question that arises in this case is whether substantial evidence supports Commerce's determination that the contested products constitute "other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, [subject] merchandise."  19 U.S.C. § 1677(16)(A).  To be sure, that analysis requires consideration of what the scope of the *Order* covers.  Here, Commerce determined that, in view of the language of the scope, the identified physical characteristics, and other record evidence, the contested products are identical to the

subject merchandise as described in the *Order*.[9] The court first considers BGH's arguments regarding FEBs generally before separately considering particular arguments regarding the forged steel bars and custom blocks.

**A. Fluid End Blocks**

As an initial matter, BGH's contention that the term FEB is not defined in the scope such that Commerce should have considered the HTSUS[10] and ITC report from the underlying investigation to give the term its "plain meaning" is not persuasive. Pl.'s Mem. at 9–10.

BGH first identifies as relevant HTSUS subheading 8413.91.9055, which describes FEBs under heading 8413, covering "Pumps for liquids, whether or not fitted with a measure device; liquid elevators; parts thereof." *Id.* However, while Commerce includes HTSUS subheadings "for convenience and customs purposes" in its scope, that scope explicitly contemplates subject merchandise consisting of products entered into the United States under a number of subheadings in addition to 8413.91.9055. *See* I&D Mem. at 3 (referencing subheadings 7218.91.0030, 7218.99.0030, 7224.90.0015, 7224.90.0045, 7326.19.0010, and 7326.90.8688). These additional subheadings cover

---

[9] BGH relies on the standards for reviewing a scope determination, *see, e.g.*, Pl.'s Mem. at 7 (citing *OMG, Inc. v. United States*, 972 F.3d 1358, 1363–64 (Fed. Cir. 2020)), and many of BGH's arguments suggest that BGH's real concern lies in the fact that the scope of the *Order* does not facially exclude products such as the contested products. *See* Pl.'s Mem. at 12 ("[FEBs] require an exacting microstructure and specialized mechanical properties. This requires a very high forging reduction rate . . . ."). In the underlying review, BGH acknowledged at the hearing before Commerce that certain arguments "have to do broadly with the scope of the investigation," Hr'g Tr. (July 25, 2024) at 7, PR 97, CJA Tab 16, which BGH described as "very, very broad," *id.* at 18.
[10] HTSUS stands for "Harmonized Tariff Schedule of the United States."

Court No. 24-00176                                                                                                                            Page 13

various types of stainless steel, alloy steel, and other articles of iron or steel. *See* Headings 7218, 7224, 7326, HTSUS. BGH does not address these subheadings, despite relevant arguments made by the Government. *See* Def.'s Resp. at 14; Pl.'s Reply at 3 (discussing only subheading 8413.91.9055). Thus, BGH's preferred heading is not a basis for narrowing the requirements for the foreign like product.

With respect to the ITC report, BGH identifies language stating that "FEBs are steel forgings that are a component of fluid end modules ('FEMs'), which are incorporated into hydraulic pumps." Pl.'s Mem. at 10 (quoting *Fluid End Blocks from China, Germany, India, and Italy*, Inv. Nos. 701-TA-632-35, 731-TA-1466 and 731-TA-1468, USITC Pub. 5152 at 10 (Jan. 2021) (final)). Commerce's scope is, however, consistent with this definition insofar as it states that FEBs "are typically used in the manufacture or service of hydraulic pumps." I&D Mem. at 2. Moreover, Commerce explained that it did not need to consider the ITC report and related documents "[b]ecause the language of the scope description itself is dispositive." *Id.* at 7 n.17. BGH's reliance on the ITC report in an effort to introduce an end-use restriction in the scope lacks merit because, as discussed below, end-use restrictions must be clear.[11]

---

[11] BGH also argues that the ITC's injury determination was limited to finished FEBs or unfinished FEBs that had no other purpose besides the production of finished FEBs. Pl.'s Mem. at 15–16. Thus, according to BGH, "[t]he ITC made no injury determination concerning general forged steel products." *Id.* at 16. It is true "that an antidumping duty order must be supported by an ITC determination of material injury covering the merchandise in question." *Wheatland Tube Co. v. United States*, 21 CIT 808, 819, 973 F. Supp. 149, 158 (1997), *aff'd*, 161 F.3d 1365 (Fed. Cir. 1998). But a foreign like product determination in an annual review is an ill-suited vehicle for such a challenge that is more appropriately raised in a challenge to Commerce's *Final Determination* in

At its core, BGH's argument that an FEB must be defined as something "designed and intended for 'incorporation into a pump fluid end assembly,'" Pl.'s Mem. at 14, is an argument for defining the subject merchandise based on end use.[12] However, the U.S. Court of Appeals for the Federal Circuit has long held that "end-use restrictions do not apply to AD orders unless the AD order at issue includes clear exclusionary language" that "leave[s] no reasonable doubt that certain products were intended to be outside the scope of the AD order based solely on the end use of those products." *King Supply*, 674 F.3d at 1349.  That is because "the physical characteristics of an imported product are more readily identifiable than the product's end use, which may be unclear at the time of importation." *Id.* at 1348.  For that reason, Commerce "consistently uses express terms such as 'only' or 'solely' to indicate restrictions on end uses for certain products." *Id.*[13]

---

the investigation, or in a request for a Commerce scope ruling, wherein the agency and all interested parties may directly engage the factual and legal bases of BGH's arguments and the implications thereof.

[12] BGH's attempt to deny this point is not persuasive.  BGH asserts that it is arguing to define FEBs by their design and function.  Pl.'s Reply at 6–7.  But function is just another way of stating what something does, i.e., how it is *used*.  BGH also relies on statements regarding unfinished FEBs being dedicated for use in the production of finished FEBs.  *See* Pl.'s Mem. at 14–16.  These statements are in furtherance of BGH's argument about the design and function of finished FEBs, Pl.'s Reply at 8–9, which, for the reasons stated, the court rejects as a basis for injecting an end-use requirement into the scope in the absence of clear language.

[13] Plaintiff seeks to distinguish *King Supply* on its facts.  Pl.'s Reply at 9.  Plaintiff argues that, in that case, the product at issue had several applications and the ITC acknowledged that the injury determination encompassed the domestic like product "regardless of use."  *Id.* (citation omitted).  But the holding of *King Supply* remains: an order must leave no doubt that a product is excluded from the scope based on end use.  That is a high bar, and one that is not met here.

In contrast, here, Commerce used the term "typically," I&D Mem. at 2, which facially contemplates some non-typical uses. And as Commerce further explained, the contested products would present precisely the type of enforcement issue at the border the *King Supply* court was concerned with:

> BGH confirmed during the hearing for this review [that] there is no way to identify the [contested] products at issue physically. Rather, BGH suggested identification of the products at issue would require the examination of drawings *to note* the intended purpose of the product according to the drawings, the customer, the name of the product, and production methods (i.e., "production ratio") and other elements that are not part of the record in order to determine the intent for which the products are "specifically designed."

*Id.* at 7–8 (emphasis added) (footnotes omitted). Commerce emphasized that the products may not be identifiable from "specifications on the drawings themselves," but there may be "some indication from the customer on the drawings as to the intended purpose of the product." *Id.* at 8 n.20. But sales of the contested products otherwise "meet the scope description of the order." *Id.* at 6. Thus, Commerce's reliance on the language of the scope description alone to resolve whether to include the contested products in the normal value calculations is in accordance with law and supported by substantial evidence.[14]

---

[14] Defendant-Intervenors argue that Commerce previously determined that "forged steel blocks meeting the specifications of fluid end blocks, as defined in the scope," are subject merchandise. Def.-Ints.' Resp. at 14 (citing, *inter alia*, Scope Cmts. Decision Mem. for the Prelim. Determinations, A-428-847, et al. (May 18, 2020)). Defendant-Intervenors quote from Commerce's preliminary scope memorandum from the original investigation, although they acknowledge that Commerce did not base its determination here on those earlier findings. *Id.* They made a similar argument to Commerce in their administrative rebuttal brief filed in March 2024 and, while Defendant-Intervenors cited

**B. Forged Steel Bars**

BGH argues that the forged steel bars produced by BGH Lippendorf "are substantially different from forged steel blocks." Pl.'s Mem. at 19.[15] Such differences include cross-sectional dimension, length, and overall shape and size that BGH contends renders the bars "not suitable for incorporation into the fluid end assembly of a hydraulic pump" and "unsuited to the production of [FEBs]." *Id.* Additionally, BGH argues, "forged bars are produced on smaller, less powerful forging equipment." *Id.* But BGH's arguments all rest on the false premise that, for purposes of the *Order*, FEBs have a particular and exclusive end use. More importantly, the characteristics that BGH identifies are not among those listed in the scope or in the physical characteristics

---

to the preliminary investigation scope memorandum, there is no indication that the memorandum had been placed on the record of this segment of the proceeding. Pet'r's Rebuttal Br. (Mar. 15, 2024) at 6 & n.16, PR 89, CJA Tab 15 ("It is rather incredible that BGH continues to argue that its 'forged steel blocks' should be excluded when Commerce already decided this specific issue in the original investigation.") (underline and citation omitted). Prior to April 24, 2024, Commerce required unpublished but public scope determinations to be placed on the record for the agency's consideration. *Compare* 19 C.F.R. § 351.104(a)(2023), *with* 19 C.F.R. § 351.104(a)(6)(xi) (eff. Apr. 24, 2024) (providing for citation to investigation scope memoranda without placement on the administrative record). Perhaps because the scope memorandum was not on the record, Commerce did not address the argument by Defendant-Intervenors. The agency did, however, explain in response to an argument by BGH that it considered the scope language dispositive and thus did not need to consider additional materials. See I&D Mem. at 7 n.17. Accordingly, the court does not consider the preliminary investigation scope memorandum as support for Commerce's determination here.

[15] Plaintiff argues, for the first time in its reply brief, that forged steel bars produced by its affiliate BGH Lippendorf do not meet the statutory requirement for production "by the same person." Pl.'s Reply at 13–14 (citing 19 U.S.C. § 1677(16)(A)). This argument was not presented to the agency or raised in Plaintiff's moving brief and is thus not properly before the court and will not be considered. *See* 28 U.S.C. § 2637(d) (governing exhaustion of administrative remedies); *Novosteel SA v. United States*, 284 F.3d 1261, 1273–74 (Fed. Cir. 2002) (discussing forfeiture of arguments).

Court No. 24-00176                                                                     Page 17

Commerce relied on for determining the foreign like product. I&D Mem. at 2–3; Prelim. Mem. at 7. Commerce thus did not err in including these forged steel bars in the foreign like product.

### C. Custom Blocks

BGH's argument regarding its custom blocks is another thinly veiled argument for the creation of an end-use restriction. Pl.'s Mem. at 21 ("[BGH] provided specific documentation showing that these Military Equipment Blocks and Compounding Machine Blocks were designed and produced for specific *end products unrelated to* fluid end blocks or pumps." (emphasis added)). The argument is, thus, readily rejected for the reasons already stated with regard to other asserted end use exclusions.

BGH's reliance on an unrelated order that contains an explicit exclusion for certain military grade merchandise is misplaced insofar as the underlying *Order* in this case contains no such explicit exclusion. *See* Pl.'s Mem. at 29–30 (citing *Certain Carbon and Alloy Steel Cut-To Length Plate From Austria, Belgium, France, the Federal Republic of Germany, Italy, Japan, the Republic of Korea, and Taiwan*, 82 Fed. Reg. 24,096, (Dep't Commerce May 25, 2017) (am. final affirmative antidumping determinations for France, the Federal Republic of Germany, the Republic of Korea and Taiwan, and antidumping duty orders)); I&D Mem. at 8 (addressing the argument).

Further, while BGH seeks to analogize the issue here to the scope inquiry addressing what constitutes a nail in *OMG, Inc. v. United States*, 42 CIT \_\_, \_\_, 321 F. Supp. 3d 1262, 1268–69 (2018), *aff'd*, 972 F.3d 1358 (Fed. Cir. 2020), Pl.'s Mem. at 23, the *OMG* court considered it necessary to consult dictionaries to define the term "nail,"

*OMG*, 321 F. Supp. 3d at 1268–69.  Here, however, there is no need to resort to additional authorities to define the term FEB because BGH's specific arguments were resolved by reference to the scope language.  I&D Mem. at 7 n.17.  The court finds no error in that determination, or in Commerce's inclusion of the custom blocks in the foreign like product.

### D.  BGH Failed to Exhaust Its Alternative Argument

The CIT "shall, where appropriate, require the exhaustion of administrative remedies."  28 U.S.C. § 2637(d).  "[T]his statutory mandate indicates a congressional intent that, absent a strong contrary reason, the [CIT] should insist that parties exhaust their remedies before the pertinent administrative agencies."  *Weishan Hongda Aquatic Food Co. v. United States*, 917 F.3d 1353, 1362 (Fed. Cir. 2019) (alterations in original) (citation omitted).  Regarding BGH's alternative argument, the court finds that BGH failed to exhaust this argument before Commerce.[16]

With respect to the forged bars produced by BGH Lippendorf, BGH now argues that Commerce's model-match criteria "do not adequately account for [the] physical differences in configuration, core compression and other physical and mechanical properties."  Pl.'s Mem. at 29.  BGH also argues that its custom military blocks "have significant differences in physical/mechanical properties (*e.g.*, size, shape, configuration, etc.) in comparison to [FEBs]" and its compounding machine blocks likewise "have significant differences in physical" or "mechanical properties (*e.g.*, size,

---

[16] Thus, the court need not address Defendant-Intervenors' additional argument that BGH failed to provide notice of this issue in its complaint.

shape, configuration, chemical content, etc.) in comparison to [FEBs]." *Id.* at 29–30. For the custom military blocks, BGH goes further to assert that they are "a completely different class or kind of merchandise." *Id.* at 30. In response to the Government's argument that adjusting "for different product types requires a highly fact-intensive inquiry" such that "Commerce requires that parties raise model match arguments early in administrative proceedings," Def.'s Resp. at 18, BGH merely references the argument that U.S. FEB sales should not be compared to any home market sales of the contested products, Pl.'s Reply at 16 (citing Case Br. at 17, 19–20).

      BGH failed to raise this issue before Commerce at the appropriate time and with sufficient clarity to have exhausted its administrative remedies. Commerce has a long practice of "address[ing] model match criteria early in a segment of a proceeding so that all parties have an opportunity to comment and address any reporting issues which may result from changes," rather than after a respondent learns of the impact on its margin calculations. Decision Mem. for Honey from Argentina, A-357-812 (May 27, 2004) at 28.[17] Indeed, Commerce may reasonably reject proposed changes to model-matching criteria when they are made in a case brief—or even earlier. *See JTEKT Corp. v. United States*, 38 CIT 1957, 1962, 1966–71, 37 F. Supp. 3d 1326, 1331, 1334–38 (2014) (noting the court's earlier decision to sustain Commerce's rejection of changes first proposed in a case brief and further finding that Commerce permissibly declined to

---

[17] Commerce's decision memoranda are publicly available at https://access.trade.gov/public/FRNoticesListLayout.aspx, with separate links for pre- and post-June 2021 memoranda.

consider other changes proposed before the preliminary results). Thus, even if BGH had proposed model-match changes in its case brief, Commerce could have reasonably declined to consider them. But BGH did not do so in any case. Rather, BGH broadly asserted that Commerce should not compare the contested products to FEBs sold to the U.S. market and should exclude sales to certain customers entirely. Case Br. at 17, 19–20.[18]

Accordingly, the court need not, and therefore does not, consider the merits of BGH's alternative argument.

## CONCLUSION

For the reasons discussed above, the court will sustain the *Final Results*. Judgment will enter accordingly.

/s/     Mark A. Barnett  
Mark A. Barnett, Chief Judge

Dated: October 22, 2025  
New York, New York

---

[18] For the latter argument, BGH asserted that "Commerce has considered product application as a matching criterion in other proceedings." Case Br. at 19. However, BGH made that argument in support of its argument regarding the exclusion of sales to certain customers. *See id.*